COURTEMANCHE *v.* SUPREME COURT, INDEPENDENT
ORDER OF FORESTERS.

1. LIFE INSURANCE—SUICIDE—INTENTION OF ACT.
   Death caused by assured's taking poison, not with the intent
   to commit suicide, but to frighten his wife into giving him
   money, is not within a clause in the policy excepting "assur-
   ance against self-destruction or suicide."

2. TRIAL—REQUESTS TO CHARGE.
   It is not error to refuse a request to charge, a portion of which
   is improper.

Error to Saginaw; Beach, J. Submitted February 3,
1904. (Docket No. 70.) Decided March 8, 1904.

*Assumpsit* by Emma Courtemanche against the Su-
preme Court of the Independent Order of Foresters upon
a benefit certificate. From a judgment for plaintiff, de-
fendant brings error. Affirmed.

*Dickinson, Stevenson, Cullen, Warren & Butzel,* for
appellant.

*W. F. Denfeld,* for appellee.

HOOKER, J. The plaintiff is the widow of one Oliver
Courtemanche, and beneficiary in a certificate of member-
ship in the defendant society, a mutual benefit association.
This policy contained the following limitations upon, or
exceptions to, liability, viz. :

"(1) Except as provided in subsections 2 and 3 of this
section, the contracts for benefits heretofore or hereafter
undertaken by the supreme court do not include assurance
against self-destruction or suicide, whether the member be
sane or insane.

"(2) Any brother who commits suicide shall *ipso facto*
avoid all his benefit certificates, and *ipso facto* forfeit all
benefits whatsoever which his beneficiary or beneficiaries,

heir or heirs, or legal personal representative or representatives would otherwise have been entitled, under the constitution and by-laws, to receive from the supreme court, or from any branch of the supreme court;— * * * "

Subsection 1 being printed on the policy.

In an action brought upon this certificate, the plaintiff recovered death benefits to the amount of $1,000, that being the face of the policy. The defendant has asked us to review the cause upon error.

The most important question arises over a claim that if the death was due to the voluntary taking of carbolic acid by deceased, not with the intent of causing death, but to frighten his wife into giving him money, she could not recover. The evidence was practically conclusive that the deceased died from taking carbolic acid, and there was proof from which the jury might have reached either of three conclusions:

1. That it was a case of suicide in the ordinary sense.
2. That the drug was taken under the belief that it was another and harmless drug.
3. That it was knowingly and intentionally taken for the purpose of frightening the wife, and not with an intention to cause death.

The court instructed the jury that in the latter case the beneficiary would not be precluded from recovering upon the policy, and error is assigned upon this instruction.

Counsel for defendant cite, in support of their contention, the case of *Lawrence* v. *Mutual Life-Ins. Co.*, 5 Ill. App. 282. In that cause the deceased came to his death from repeated doses of laudanum, the first prescribed by a druggist, and others taken upon deceased's own judgment, after severe vomiting, under the belief that he had vomited up a portion of that taken. The policies contained the following provisions:

" If the said person upon whose death the policy matures shall die in consequence of a duel, or of the violation of law, or by disease, violence, or accident brought about by intoxication, or shall impair his health by narcotics or

alcoholic stimulants, * * * the company shall be released from all liability on account of this contract.

" It is hereby declared and agreed that the self-destruction of the person, whether voluntary or involuntary, and whether he be sane or insane at the time, is not a risk assumed by the company in this contract, but in every such case the company will, upon demand made and the surrender of this policy, accompanied with satisfactory proofs of such death, within sixty days after its occurrence, pay the net reserve held upon it by this company at the beginning of the year in which death occurs, calculated by the present legal standard of the State of New York, first deducting therefrom any indebtedness which shall have accrued to the company on account of this contract."

The court said:

" The present appeal, then, must be decided precisely as though the defendant had expressly admitted that the deceased, at the time of his death, was sane; that his death was involuntary, and that it occurred without negligence on his part, and as the wholly unexpected, and therefore accidental, result of means which he was using in good faith for the purpose of alleviating his physical suffering. The question, then, is whether the accidental death of a sane person is within the meaning of the foregoing condition of the policies in suit, simply because some act of the deceased, performed with no design or intention of producing death, but for an entirely innocent purpose, and without negligence, happens to be the proximate cause of his death.

" We are clearly of the opinion that a purely accidental death can in no proper sense be termed an act of self-destruction. In all the cases where construction has been given by the courts to conditions in life policies relating to the death of the insured by his own hand, the terms 'suicide,' 'self-destruction,' and 'death by his own hand' have been held to be practically synonymous. To say of a purely accidental death that it was a 'suicide,' or a 'death by his own hand,' would be simply an abuse of language. That which is purely accidental or fortuitous can no more be charged to the account of the person whose act happens to be the occasion of the accident than to that of any one else. It is only where death results from an express design on the part of the deceased, or from some act which, though performed with no intention of produc-

ing death, is of itself culpably negligent, that the deceased can be charged with the responsibility of self-destruction. If a person in the pursuit of a proper object, and in the exercise of due care, should accidentally fall into a body of water and be drowned, or should unwittingly expose himself to the smallpox or the yellow fever, not knowing at the time of the existence of the contagion, and die of the disease, it would in no proper sense be a case of self-destruction. If in either case, however, he should be culpably negligent in exposing himself to danger, although not intending to destroy his life, he would be, in the common judgment of men, the efficient instrument of his own death. * * *

"Upon principles quite analogous to the foregoing, it may be held that in case of a sane person, where there is an absence both of intention and culpable negligence, the death of the insured must be regarded as accidental, and not within a proviso against self-destruction. With this construction, full effect may be given to all of the words of the condition in the policies under consideration. Voluntary self-destruction obviously can mean nothing more than the taking of one's life purposely and intentionally. Involuntary self-destruction would then include all those cases where a person, without intending to accomplish his own death, carelessly and negligently does acts which may naturally and probably result, and do in fact result, in death. The condition would thus be held to include all cases where there exists on the part of the insured any direct and immediate legal or moral responsibility for his own death. To go beyond this, and relieve the insurers from liability in all cases where the acts of the insured, without design or negligence on his part, do in fact contribute to shorten or terminate his life, would in most cases render life policies of very little value to the insured."

The foregoing indicates that the court was of the opinion that death through culpable negligence would not be covered by the terms of the policy. That this was at most a *dictum* appears from the following conclusion of the opinion:

"It follows that the defense in this case rests solely upon a charge against the insured of culpable negligence. This fact seems to be recognized by the learned counsel for the defendant, and accordingly they have endeavored in

their argument to demonstrate the negligence of the insured from the evidence in the case. If they desired to avail themselves of this defense, they should have allowed the question of negligence to be presented to the jury; but, having withdrawn it from the only tribunal legally competent to decide it, they are not now in a position to insist that any negligence has been proved."

The case was again tried, resulting in a verdict for the plaintiff. The court charged, in substance, that the plaintiff should recover, unless the death was the result of " either gross carelessness, or circumstances constituting him a suicide;" and continued as follows:

" The jury are further instructed, on the subject of negligence and gross carelessness, that, so far as the defense in this case depends thereon, the burden of proof rests upon the defendant; and that gross carelessness consists of something more than the omission to do that which under the circumstances of a case an ordinarily careful man would have done to avoid injury."

The appellate court criticised the charge in this language:

" It is plain that these instructions place upon the language of the policy an interpretation quite different from the one adopted by us on the former appeal. In our view, the exemption of the insurance company from liability depends, not upon the *degree* of the negligence of the insured, but upon its *culpability*. Indeed, we are unable to see how the ordinary division of negligence into degrees, such as slight, ordinary, and gross, can have any application here, though it may serve a very useful purpose in cases where the doctrine of contributory or comparative negligence is invoked. The true inquiry here is whether the death of the insured was the proximate result of his own negligent act, and whether such act was, under all the circumstances of the case, a *culpable* act.    *    *    *

" The words 'voluntary' and 'involuntary' must be regarded as being used in the policy in a sense somewhat analogous to that in which they are employed in the criminal law. They do not include cases of death by accident or 'misadventure,' but they must be held to include all cases where death results immediately and proximately

from the culpable negligence of the insured. Doubtless, also, if death should ensue from the performance by the insured of an unlawful or criminal act, it would be a case of involuntary self-destruction within the meaning of the policy.

"It follows from what we have said that the instructions limiting the effect of the condition of the policy under consideration to cases of *gross negligence,* and attempting to apply to this case the rules ordinarily applicable to that degree of negligence, were erroneous." *Mutual Life-Ins. Co.* v. *Laurence,* 8 Ill. App. 488.

It would seem to us, from the discussion in that case, that the defendant had nothing to complain of in the charge, for, to our minds, culpability implies something more than any degree of negligence. However, that does not seem to have been the view taken, and we must consider the case as holding that, while no degree of negligence without culpability will relieve a defendant, any degree of culpability will; and we do not see how there was any culpability, other than mere negligence of some degree, shown in that case. The provisions of this policy are not as broad as that involved in the Illinois case, which states that "self-destruction, though *involuntary,* is not a risk assumed by the company," while the policy before us excepts "assurance against self-destruction or suicide."

We approve the doctrine that losses by insurance companies through fire, accident, or death cannot be avoided, under ordinary provisions, although they are due to want of care. Any other doctrine would make insurance nearly valueless, especially accident insurance; and if there is any doctrine applicable to cases arising upon contracts of insurance, akin to that of contributory negligence in actions of tort, we are not aware of it. Upon the other hand, there is some apparent force in the claim that insurance companies, and those who contract with them, do not anticipate that the insured will intentionally, deliberately, and unnecessarily incur the hazard of death by poison to coerce another into the payment of money to him, or for any other reason.

This is a peculiar case. Perhaps none could arise where the act of the deceased (if defendant's claim is true) could present a more pusillanimous act. We can imagine cases in which acts of great hazard and danger would be heroic, and of which we should be reluctant to say that policies were avoided because the insured intentionally and understandingly faced almost certain death, as in the case of succoring the drowning or the burning. Between these two extremes all kinds of cases can be imagined, where risks are taken for pleasure, for profit, or from humanitarian motives, and we see no way of distinguishing between them, unless it be upon moral grounds. Perhaps the word "culpability" is a proper one to use, if not enlarged to include negligence in which no moral question is involved; but we think such a question would be more appropriately raised under a provision excepting cases of death caused while engaged in an unlawful act,— a provision found in most policies, and regarding which the authorities are numerous.

We are cited to the case of *Ritter* v. *Insurance Co.*, 169 U. S. 157 (18 Sup. Ct. 300), in support of the proposition that the act of the insured should preclude recovery. The question in that case was whether a recovery could be had in a case of suicide while sane, in the absence of a provision in the policy excepting such cases. It was held that recovery could not be had in such a case, upon the ground that the parties did not contemplate insurance against deliberate, intentional self-destruction. The case is compared to and classed with the willful burning of insured property, and several similar cases are cited and discussed, viz.: *New York Mut. Life-Ins. Co.* v. *Armstrong*, 117 U. S. 591 (6 Sup. Ct. 877), where the beneficiary murdered the insured; *Hatch* v. *Insurance Co.*, 120 Mass. 550 (21 Am. Rep. 541), where a married woman died from an unlawful operation voluntarily submitted to; *Supreme Commandery Knights of the Golden Rule* v. *Ainsworth*, 71 Ala. 436 (46 Am. Rep. 332), where it was held that suicide was an exception to the contract of insur-

ance, though not specifically made so by the policy; also the case of *Amicable Society* v. *Bolland*, 4 Bligh, N. R. 194, cited in support of the doctrine that, as a general proposition, "the law will not enforce contracts and agreements that are against the public good, and therefore are forbidden by public policy." In that case the assured was executed for forgery. In disposing of the case the court said:

"It appears to me that this resolves itself into a very plain and simple consideration. Suppose that in the policy itself this risk had been insured against,—that is, that the party insuring had agreed to pay a sum of money year by year, upon condition that in the event of his committing a capital felony, and being tried, convicted, and executed for that felony, his assignees shall receive a certain sum of money; is it possible that such a contract could be sustained? Is it not void upon the plainest principles of public policy? Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes, namely, the interest we have in the welfare and prosperity of our connections? Now, if a policy of that description, with such a form of condition inserted in it in express terms, cannot, on grounds of public policy, be sustained, how is it to be contended that in a policy expressed in such terms as the present, and after the events which have happened, we can sustain such a claim? Can we, in considering this policy, give to it the effect of that insertion, which if expressed in terms would have rendered the policy, as far as that condition went at least, altogether void?"

Counsel persuasively apply the same test to this case, and urge that a policy which in express terms should contemplate and provide insurance against the danger resulting from the voluntary taking a chance of death, as in this case, would be void, as opposed to public policy. If the proofs showed that this was an experiment to determine whether death would follow the taking of the drug, showing that the contingency of death was not overlooked, it is possible that we might be justified in saying that such act, if followed by death, was not within the intent of the parties to the contract; but there is nothing in this case to indicate a design to take life, or that deceased thought

that he was courting danger of death. We cannot suppose that any one would approve such an act as taking poison to coerce a wife through sympathy or fear, but we are not sure that the test applied in the *Bolland Case* can be safely treated as an infallible one. We are unable to find any case where this has been so held, or any where the rule has been applied, except where the act has been criminal, or accompanied by an intention to produce death. In the Alabama case cited it is said:

" The doctrine asserted in *Fauntleroy's Case* [*Amicable Society* v. *Bolland*], that death by the hands of public justice, the punishment for the commission of crime, avoids a contract of life insurance, though it is not so expressed in the contract, has not, so far as we have examined, been questioned, though the case itself may have led to the very general introduction of the exception into policies. The same considerations and reasoning which support the doctrine seem to lead, of necessity, to the conclusion that voluntary, criminal self-destruction—suicide, as defined at common law—should be implied as an exception to the liability of the insurer, or, rather, as not within the risks contemplated by the parties, reluctant as the courts may be to introduce, by construction or implication, exceptions into such contracts, which usually contain special exceptions."

Again:

" The fair and just interpretation of a contract of life insurance made with the assured is that the risk is of death proceeding from other causes than the voluntary act of the assured producing, or intended to produce, it. The extinction of life by disease or by accident, not suicide, voluntary and intentional, by the assured while in his senses, is the risk intended; and it is not intended that, without the hazard of loss, the assured may safely commit crime."

If one point a loaded pistol at himself, with no intention to fire, his death, being caused by its unintentional discharge, would be accidental, and not suicidal, and the beneficiary under such a policy as this should be allowed to recover; for the death, though self-destruction in one sense, in another was not, the immediate cause being the unexpected and accidental discharge, and not the pointing,

of the pistol, which was in itself a harmless, though perhaps a risky, act. The death in such case is a fortuitous result, not even a probable one, and such deaths are covered by policies. The case in question cannot be distinguished in principle from the foregoing, except in the greater degree of danger of a fatal result, or in the nature of the motive actuating the deceased. In the former the victim would believe he would be safe as long as he did not pull the trigger; in the latter, that he would not die if he limited the dose taken to an amount that would be insufficient, ordinarily, to cause death. A fatal result in either case, being unintended and unexpected, would be accidental, regardless of the motive which should prompt the act. It should be stated that such a death might not be covered by a policy which by its terms excepts cases where death or accident is due to voluntary exposure to danger, as in the Illinois policies discussed.

From the foregoing it would seem to follow that negligence is not a reason for relieving the insurer, and the motive certainly would not be in some of the instances we have mentioned. We do not see that the fact that the motive alleged here was to work upon the sympathy or fears of his wife would make the death of the insured any the less accidental, or that the act was a criminal one, and we are of the opinion that the court did not err in declining to direct the jury that they should treat this claim as a sufficient defense if proved.

Upon the trial the defendant's counsel introduced in evidence a letter written by plaintiff to defendant's lawyer, at his suggestion. Plaintiff testified:

"After the death of my husband, I talked with Mr. Elliott G. Stevenson, of Detroit, once at Mr. Allen's office in this city, and once in Bay City. The talk I had with him at Saginaw led up to the writing of the letter that is introduced in evidence. I didn't see him at a meeting of the Foresters. I don't know what he came to Saginaw for. It was something about the Foresters, and I knew he was in town, and I made it my business to see him,

because I wanted to see what he had to say about paying that insurance; and he told me that the executive council was to meet in a short time, a week or two afterwards, and he would see what he could do for me, and he told me to write him a letter a short time before, so he would have that to put before the council, whatever it was, to show if I could give any excuse for it,—if I knew of any reason at all why he should have committed suicide, or anything of the kind."

The letter is as follows:

"Mr. E. G. Stevenson.

"*Dear Sir:* My husband, Oliver Courtemanche, was a member of Court Valley 232, of East Saginaw, and died Sep. 28/98. The Corinors jury brought in a verdict of Sueside while Under the Influence of Liquor, which was Intirely False and unjust, as he had not been Drinking at all that Day. Dr. F. W. Freeman, who conducted the Post Mortom, also sais that there was not a Drop of Liquor or Beer of eny kind in his stomac, and if he took Carbolic Acid, as they say he did, I honistly and Firmly do not think it was with the Intentioris of Killing himself, but rather to scare me into giving him Money. He had given three different People his checque, and had no Money in the Bank, and he knew he would get into trouble over it, and I had told him that I would not help him eny more and Borrow Money for him, and he had borrowed all He could, and so I Persume he thought he would have to do something more Desperet than usual In Order to Scare me Into getting the Money for him, And so tryed that way of getting it and took more than he Intended, for there is no reason that I know of why he should want to Kill Himself. We had not quarreled, And always got along well together, and there was nothing that trubbled him that I can find out outside of those checques, and surly Twelve Dollars, the Amount of three checques, wasent worth Killing onesself for, and I know he did not Intend to do It, for he always spoke and acted as if he had a horror of sueside. It is Nearly a year and two Months since he Died, but the Foristers havent Paid me the Thousand Dollars, the amount his Policy calls for, and I should very much like to have it, as he carried no other Insurance, and it is all I have in the world, and I have Myself to suport, and It would be very nice to know I had something for a Rainey Day. Will you kindly Present

this to the supream counsil at there next Meeting, and ask them to Please Pay Me, and I will be sincerely grateful to You and Them.

[Signed] "MRS. EMMA COURTEMANCHE."

Counsel requested the court to charge:

"The letter written by plaintiff in this case, in which certain admissions are made by her in respect to quarrels and the issuing of checks fraudulently, and the possible desire on the part of her husband to do something more desperate than usual, was proper evidence in this case against the plaintiff, and you shall consider such admissions for what they are worth in arriving at the question as to whether the plaintiff's intestate did not, for these reasons, and with the motive therein stated, take the carbolic acid or drug in question, and for no legitimate purpose."

This was not all of the request, the remainder being as follows:

"If you find that he did so take the drug, and that, contrary to his expectation, the dose was fatal, even though such thought was farthest from his mind, nevertheless death resulting from such act would be suicide, and the plaintiff cannot recover in this case, save such amount as defendant has offered to pay in open court."

Having determined that the rule is not as stated in the last-quoted portion of the request, it is manifest that the court did not err in refusing a request of which it was a part.

We think it unnecessary to discuss the other questions raised.

The judgment is affirmed.

The other Justices concurred.