# CHRISTINA M. MESSERSMITH v. SUPREME LODGE, KNIGHTS OF PYTHIAS.

### (153 N. W. 989.)

**Life insurance policy — action on — proof of death — suicide — issue for jury — evidence — spirits, health, domestic relations — proper evidence.**

Action upon life insurance policy. The existence of the policy and death

---

Note.—Suicide as a defense to an insurance policy has been the subject of much litigation. For general discussions of the subject, see notes in 59 Am. Dec. 487, 3 Am. Rep. 454; 19 Am. Rep. 628; and 84 Am. St. Rep. 539.

That statements as to cause of death in proofs of loss are prima facie evidence but are not conclusive, see note in 44 L.R.A. 853.

of, insured admitted. Defendant offered no evidence excepting the **proofs** of death, which are alleged to contain admission of suicide.

1. The issue for the jury was whether or not the insured had in fact suicided. The proofs of death were admitted merely as evidence upon that point. Certain evidence, tending to show the spirits, health, and domestic relations of the insured just prior to his death, was properly admitted.

**Evidence that insured was father of first child — statements of attorney — domestic life and health of insured.**

2. Evidence that the insured was the father of his first child, two months of age, was properly admitted. There was no error in the statement of plaintiff's attorney to the court, in answer to an objection to said evidence, as follows: "I have a right to show that his domestic life was happy; that he was a young married man; that he was in superb health."

**Successful in business — man of attainments — evidence of — proper.**

3. There was no error in admitting evidence that insured was successful in business, and was a man of scholarly attainments.

**Res gestæ — statements of insured — immediately before leaving home — part of.**

4. Statements made by insured immediately before he left his family, and almost immediately before his death, are admissible as part of the *res gestæ.*

**Letter written by defendant — to its local secretary — rejection of — plaintiff had not seen same.**

5. There was no error in rejection of a letter written by the defendant to its local secretary, which letter plaintiff denied having ever seen.

**Evidence — jury — verdict — sufficient to support.**

6. Evidence examined, and found sufficient to justify its submission to the jury; and supports the verdict.

Opinion filed June 22, 1915.

Appeal from the District Court, Stark County, *Crawford, J.*
Affirmed.

*Thomas H. Pugh,* for appellant.

The proofs of loss are competent evidence against the party furnishing them, of the cause or extent of a loss, or the cause of death of an insured person, or of any other material fact therein recited; and ordinarily the rule extends to certificates and affidavits of physicians and others, and verdicts of coroners' juries. 7 Enc. Ev. 594; Dennis v. Union. Mut. L. Ins. Co. 84 Cal. 570, 24 Pac. 120; Nelson v. Nederland L. Ins. Co. 110 Iowa, 600, 81 N. W. 807; 7 Enc. U. S.

Sup. Ct. Rep. 193; Mutual Ben. L. Ins. Co. v. Newton, 22 Wall. 32, 22 L. ed. 793; Mutual Ben. L. Ins. Co. v. Higginbotham, 95 U. S. 380, 24 L. ed. 499; Buffalo Loan, Trust & S. D. Co. v. Knights Templar & Masonic Mut. Aid Asso. 126 N. Y. 450, 22 Am. St. Rep. 839, 27 N. E. 942; Hanna v. Connecticut Mut. L. Ins. Co. 150 N. Y. 530, 44 N. E. 1099; Modern Woodmen v. Von Wald, 6 Kan. App. 231, 49 Pac. 782; Travelers' Ins. Co. v. Melick, 27 L.R.A. 629, 12 C. C. A. 544, 27 U. S. App. 547, 65 Fed. 178; McMaster v. Insurance Co. of N. A. 55 N. Y. 228, 14 Am. Rep. 239; Hassencamp v. Mutual Ben. L. Ins. Co. 56 C. C. A. 625, 120 Fed. 475.

The general rule as to character evidence is applicable here. The proof of the fact of suicide of the insured emanated from the plaintiff, and evidence of disposition, character, mental attainments, or family relations was incompetent and immaterial, as not within the issues. State v. Magill, 19 N. D. 131, 22 L.R.A.(N.S.) 666, 122 N. W. 330; State v. Thoemke, 11 N. D. 387, 92 N. W. 480; 5 Am. & Eng. Enc. Law, 2d ed. 879, 880.

In all proceedings, where the character or particular traits of character are allowed to be shown or proved, the general reputation, the reflex of the community only, may be shown, and not the individual opinion of the witness. Munkers v. Farmers' & M. Ins. Co. 30 Or. 211, 46 Pac. 850; Abbott, Trial Brief, 236.

*L. A. Simpson,* for respondent.

The proofs of death, which are the work of the defendant, even though they showed that death was by suicide, would not be binding on plaintiff, but were subject to corrections of honest mistakes, and such corrections and explanations could properly be made at and upon the trial. Dischner v. Piqua Mut. Aid & Acci. Asso. 14 S. D. 436, 85 N. W. 998; Supreme Tent, K. M. v. Stensland, 206 Ill. 124, 99 Am. St. Rep. 137, 68 N. E. 1098.

Where the *cause* of death is called in question, the proofs of death are not binding upon either party. Knights Templars & M. Life Indemnity Co. v. Croyton, 209 Ill. 550, 70 N. E. 1066.

. Suicide or self-destruction must be intentional, in order to defeat recovery, under the usual stipulation in such policies of insurance. 25 Cyc. 878, ¶ "D;" Paulsen v. Modern Woodmen, 21 N. D. 235, 130

N. W. 231; Soules v. Brotherhood of American Yeomen, 19 N. D. 23, 120 N. W. 760.

The presumption is that the insured did not commit suicide, and the burden is upon the defendant to overcome such presumption. Ordinarily, the question is strictly one for the jury. Any inferences to be drawn from the evidence would not justify the jury in finding that death was caused by suicide. Mutual L. Ins. Co. v. Wiswell, 56 Kan. 765, 35 L.R.A. 258, 44 Pac. 996; Mutual L. Ins. Co. v. Daviess, 87 Ky. 541, 9 S. W. 812; Standard Life & Acci. Ins. Co. v. Thornton, 49 L.R.A. 116, 40 C. C. A. 564, 100 Fed. 582.

The law fixes upon the defendant claiming suicide the burden of proving such fact by a preponderance of the evidence. Brown v. Sun L. Ins. Co. — Tenn. —, 51 L.R.A. 252, 57 S. W. 415; Boynton v. Equitable Life Assur. Soc. 105 La. 202, 52 L.R.A. 687, 29 So. 490. Where the evidence as to the cause of death is conflicting, and is such that different minds might reasonably come to different conclusions, the question is for the jury. Courtemanche v. Supreme Court, I. O. F. 136 Mich. 30, 64 L.R.A. 668, 112 Am. St. Rep. 345, 98 N. W. 749; Modern Woodmen v. Kozak, 63 Neb. 146, 88 N. W. 248. The defense of suicide is an affirmative one, and the burden was upon defendant to substantiate it by a preponderance of the evidence. Leman v. Manhattan L. Ins. Co. 46 La. Ann. 1189, 24 L.R.A. 589, 49 Am. St. Rep. 348, 15 So. 388; Travelers' Ins. Co. v. Melick, 27 L.R.A. 629, 12 C. C. A. 544, 27 U. S. App. 547, 65 Fed. 178.

BURKE, J. This is an action upon a life insurance policy. The defense is that the insured suicided. Plaintiff had judgment. Defendant appeals. The errors claimed relate to the admission of testimony relative to deceased's family and business affairs, and to the refusal of the trial court to direct a verdict for defendant. The beneficiary, the wife of the insured, submitted written proofs, in which the cause of death was given as "gunshot wound, self-inflicted." Upon the trial, said beneficiary was a witness, and denied that she knew said answer was in the proofs of death at the time her signature was attached. The physician, likewise, receded somewhat from his earlier certificate, and it was conceded by both parties that the question of whether or not deceased was a suicide was the gist of the action. It is con-

ceded that the proofs of death were properly admitted as prima facie evidence of the material facts therein shown, but that such evidence is not conclusive, but might be rebutted.

(1) While upon the stand as a witness in her own behalf, plaintiff was asked the following questions by her attorney:

"Q. You and your husband were happy together up to the time of his death, Mrs. Messersmith?" Also: "Q. I will ask you to state, Mrs. Messersmith, whether your husband during all that time, and while in your presence, was in his usual good spirits?" Also: "Q. I will ask you to state whether or not you observed anything unusual in his manner." The witness, Reichert, was also asked: "Q. Whether he appeared in his usual spirits." And, "Q. Whether you noticed anything unusual in his manner or action that day." The witness, Mrs. Carroll, was also asked some questions: "Q. Do you know whether or not his domestic relations were happy?" The witness, Mrs. Simpson, was asked: "Q. Whether or not your brother upon that occasion (a few hours before his death) appeared in his usual frame of mind?" And, "Q. Can you tell us whether his domestic relations were happy always up to the time of his death, and *if so, state whether they were or not.*" Also: "Now, I will ask you to state whether or not he was in his usual frame of mind when he left the house, or usual spirits?" All of this testimony is objected to, upon the grounds that it did not bear upon the general reputation of the deceased, nor upon his character, those being not in issue; that the testimony sought to draw out special instances of the temperamental disposition of the deceased, and is the opinion of the witness testifying, and not the reflex of the community in which he lived; and that the fact to be found was whether or not deceased suicided, and the temperamental disposition, character, and mental attainments of the assured were not pertinent to the issues. Appellant contends that, inasmuch as the proofs of loss which were in evidence stated that death had resulted from suicide, the direct issue was rebuttal of said proofs, and that the questions complained of could only be relevant in the event the defendant had first undertaken to show a motive for the suicide. We do not believe there was any error in the admission of the questions before mentioned. The incidents related occurred the afternoon of his death. They all tended to show his mental condition, and had

a direct bearing upon the probability of suicide. As we view the matter, the insurance policy and the death were conceded. The burden, then, was upon the defendant, to prove the exemption from liability afforded them if the insured had in fact committed suicide. This burden they met by an offer in evidence of the proofs of death, signed by the beneficiary, who in her turn had a right to rebut this testimony; and this she attempted to do by showing facts and circumstances to lead the jury to believe suicide was impossible. We believe the evidence was properly admitted.

(2) Plaintiff was asked: "Q. How old was your baby at the time of your husband's death?" And was allowed to answer, over objection, that it was about two months old. During the argument upon this objection, plaintiff's counsel stated to the court in the hearing of the jury: "I have the right to show that his domestic life was happy. That he was a young married man; that he was in superb health." This remark of counsel was objected to as being prejudicial, and an attempt to prejudice the jury, and was "the heaping of fuel upon the sympathies and sentiments of the jurors, who were sitting to determine a way to compel the insurance company to pay." It will be noticed that the remark was not made to the jury, but to the court, in argument upon objection interposed to a question which he had just asked the witness. We fail to see the slightest indication of any attempt to bias or prejudice the jury. There is no error in the incident.

(3) Appellant complains of the following questions propounded to the plaintiff: "Q. Was your husband enjoying a successful and prosperous practice in his profession at this time?" (Objection.) And also the following question, asked of the witness Reichert: "Q. Mr. Reichert, you have stated that you knew Mr. Messersmith very well; I will ask you to state whether or not he was a scholarly or an illiterate men." Practically the same objection disposed of in paragraph (1) was made to those questions. They both have their bearing, though possibly slight, upon the probability of the suicide, and were admissible.

(4) This assignment challenges two questions, one asked of the witness, Mrs. Carroll, and relates to the time deceased left his sister's home, a few moments before his death. The questions are: "Q. What did Mr. Messersmith say, if you remember, as to what he was

going to do when he left the house? A. He said that he was going down to the house, to fix the fire so the house would be warm, and he would come back and get his wife and baby." The other question was asked of Mrs. Simpson: "Q. As he left the house, if you heard and know, please state what reason was assigned for his leaving? A. He went down to his little house for the purpose of rebuilding the fires, or looking after the fires, so it would be warm for his wife and baby." Appellant in his brief says: "We submit that, unless it were shown that the statements were made by the deceased in the belief that he was in imminent danger of losing his life, or that death was rapidly approaching, the testimony is not competent to the issues in this case, as part of the *res gestæ.*" Appellant is invoking an entirely foreign rule. The statement of deceased was not sought for its substance—to prove or disprove any fact. They did not care for the substance of his remarks, but desired to know the condition of his mind. What he said, like his action and general demeanor, had a bearing upon his mental condition, and was admissible. Plaintiff had the right to disprove not only the admission of proofs of death, but to disprove the fact of suicide itself.

(5) The fifth assignment of error relates to the rejection of the following question asked of the witness Harleman, who was apparently the secretary of the local Knights of Pythias lodge, and who as such had helped prepare the proofs of death. The question is: "Q. I show you exhibit W and ask you if that is the letter that you received, and that you read or permitted Mrs. Messersmith to read, relative to the matters you testify to ?"—exhibit W being a letter from the defendant to its local secretary, which called attention to the statement in the proofs of death relative to the gunshot wound, and allowing her to make further proof if she desired. The plaintiff had already denied that said letter had been either shown or read to her, or in any manner called to her attention. The witness, Harleman, was allowed to testify that he had shown her the letter, and read it to her, and had informed her that she might make such further proof. This was gone into fully.

We quote from the record:

Q. And did you show her the letter, or read it to her?

A. I read it to her.

Q. And you informed her she might make such further proof as she desired?

A. I read the entire letter to her that I received from them.

Q. About how long was that after the first proof was sent in, after these proofs had been sent in?

A. It was a very few days,—I cannot recall just how long,—as soon as I could get an answer from Chicago. I received a letter after a very short delay.

Q. What was the nature of that communication by you to Mrs. Messersmith,—relative to what part of the proof she had already furnished?

A. It was relative to the suicide clause.

Q. Was permission given her to furnish such other evidence as she desired?

A. The permission was contained in the letter that was read to her.

Q. And that was in reference to furnishing proof, and additional proof, if she desired, in reference to the suicide?

A. It was.

Q. And now, at that time did you tender her any amount of money?

A. I did not.

Q. Did you at a later day?

A. No, sir.

Q. Have you forgotten it?—Mrs. Messersmith says you offered her a check.

A. I had no check, and never received any check from the insurance company, to pay Mrs. Messersmith.

Q. Did you tell her the amount that they would pay?

A. I did. They authorized me to make a statement to her. That they would pay her so much if she would surrender the policy; but I never received any money from the company to pay.

Then follows the question upon which error is predicated:

Q. I show you exhibit W, and ask you if that is the letter that you received, and that you read or permitted Mrs. Messersmith to read, relative to the matters you testify to?

To this objection was made, that it was clearly self-serving, and in no manner binding upon the plaintiff. The objection was properly

sustained. The contents of the letter were in no manner in dispute. Plaintiff insisted that she had never seen or heard of the letter, and that was the matter in dispute. The letter itself contained no evidence that plaintiff had seen it. The ruling was therefore correct.

(6) The last assignment challenges the sufficiency of the evidence as a whole, defendant contending that it was entitled to a directed verdict. A consideration of this question necessitates a short résumé of the evidence offered at the trial. Defendant offered no direct or positive evidence that the insured came to his death through suicide. Not an iota of evidence upon this phase was offered, excepting the admission of plaintiff in the proofs of death. Nor are those a positive admission. The exact language of plaintiff's statement is as follows: "13. (a) Q. Was death caused by suicide or violence or any causes other than disease? State which, and give fully the facts. A. Gunshot wound, self-inflicted. (b) Q. Did deceased ever attempt suiside? If so, give fully details, dates, etc. A. No." The statement from which the above questions are taken consists of four pages, containing something over fifty questions, and answered, signed, and verified by plaintiff, but upon blanks prepared by the defendant. The evidence discloses that Harleman, local secretary of the Knights of Pythias, received the blank proofs from the board of control of the defendant, and arranged to meet plaintiff in a law office at Dickinson, where her signature was obtained.

Plaintiff testified as follows:

Q. Have you ever read that paper, Mrs. Messersmith?

A. Not until just a few days ago.

Q. Had you ever read that paper at the time your signature was placed upon it?

A. No.

Q. Was it read to you?

A. It was not.

Q. Was any oath ever administered to you at the time you signed that paper?

A. No. . . .

Q. Who called you to the office?

A. Mr. Harleman.

Q. How did he call you?

A. By telephone.   . . .

Q. When you went to the office, Mrs. Messersmith, whom did you find there?

A. Mr. Harleman and Dr. Davis.  ·

Q. Had you requested Dr. Davis to come there?

A. I had not.   . . .

Q. Was this paper ever in you possession, prior to the commencement of this action?

A. Never.

Q. Did you ever see it, so far as you know, prior to this suit being instituted?

A. No.

Q. Did you send any papers to the defendant, Supreme Lodge, Knights of Pythias?

A. No.

Q. Did you know where they were located?

A. I did not.   . . .

Q. Was Dr. Davis at your house the night of your husband's death, at your request?

A. No.   . . .

Q. Do you know how your husband came to his death?

A. Gunshot wound.   . . .

Q. You were not present at the time your husband died?

A. No.

Q. And have no knowledge of how his death ensued, excepting from the gunshot wound?

A. No.

Q. Mrs. Messersmith, in this paper, exhibit Y 2, and in question No. 13 of the letter (a), I find as follows: "Was death caused by suicide, or violence, or any cause other than disease? State which, and give fully the facts." And I find the language written in answer: "Gunshot wound. Self-inflicted." Do you know whose language that is?

A. Yes.

Q. Is that your language?

A. Most emphatically, no.   . . .

Q. What did Harleman say, if you remember, when he asked you to sign it?

A. Why, when he telephoned me, and also when I reached the office, he said that he had the insurance papers ready for me to sign, so that I could get my insurance. He also stated that there would be no question but that I would get the insurance.

It will be noticed that plaintiff contends that the answer was written without her knowledge, and that it never represented her true belief. If those are the facts, we see no reason why they should not go to the jury for what they are worth, and they might justify the jury in finding the admissions of the statement entirely worthless, which would leave the case as though no evidence had been interposed by the defendant. Under such circumstances, of course, plaintiff, and not defendant, would be entitled to a verdict.

Furthermore, it will be noted from the language that there is no assertion of suicide. The words "gunshot wound, self-inflicted," do not contain any positive allegation of suicide. The wound might have been self-inflicted, but by accident, in which case it would be a gunshot wound, self-inflicted, but not suicide. This question is treated rather fully in Paulsen v. Modern Woodmen, 21 N. D. 235, 130 N. W. 231. Also see note in 35 L.R.A. 263; Mutual Ben. L. Ins. Co. v. Daviess, 87 Ky. 541, 9 S. W. 812; Knights Templars & M. Life Indemnity Co. v. Crayton, 209 Ill. 550, 70 N. E. 1066; Standard Life & Acci. Ins. Co. v. Thornton, 49 L.R.A. 116, 40 C. C. A. 564, 100 Fed. 582; Brown v. Sun L. Ins. Co. — Tenn.—, 51 L.R.A. 252, 57 S. W. 415; Cox v. Royal Tribe, 42 Or. 365, 60 L.R.A. 620, 95 Am. St. Rep. 752, 71 Pac. 73; Courtemanche v. Supreme Court, I. O. F. 136 Mich. 30, 64 L.R.A. 668, 112 Am. St. Rep. 345, 98 N. W. 749; Modern Woodmen v. Kozak, 63 Neb. 146, 88 N. W. 248; Stevens v. Continental Casualty Co. 12 N. D. 463, 97 N. W. 862; Clemens v. Royal Neighbors, 14 N. D. 116, 103 N. W. 402, 8 Ann. Cas. 1111; Kephart v. Continental Casualty Co. 17 N. D. 380, 116 N. W. 349; note in 4 L.R.A.(N.S.) 637; Puls v. Grand Lodge, A. O. U. W. 13 N. D. 559, 102 N. W. 165 (holding physician's report of death, verdict of coroner's jury, and testimony of physician making post-mortem examination, not conclusive on question of cause of death); Soules v. Brotherhood of American Yeomen, 19 N. D. 23, 120 N. W. 760.

Another statement in the proofs of death was made by Dr. Davis, who answered the following questions: "12. Was death caused by violence, or other than natural causes? If so, state particulars. A. Gunshot wound, self-inflicted." This leaves the suspicion, at least, that the doctor wrote both answers, corroborating plaintiff in her testi-- mony that she did not know what was in the paper signed by her, and that the same was prepared by others. It appears from the doctor's testimony that he was not present at the time of the shooting, although a witness at the trial, and gave no evidence tending to prove that it was a case of suicide, and even seemed to have some doubt at least, of the correctness of the answer formerly made. For instance, he says:

I suppose, Judge Crawford, that under the rules and customs which govern court processes, it is not possible or right for a man to explain, if a man has made out a paper like this, to say where he thinks he made an error in it, or anything of that kind?

The court: Well, if they inquire into that, why, you may.

Q. Well, by that remark do you mean there is some error in here that you would like to correct?

A. No error, except in one particular. That definite, positive state- ment is made, where it should have been described as being possible or likely, probably.

Q. What question did you refer to?

A. Where the question is made as to the manner of the infliction of the wound. Self-inflicted. Any intelligent, thinking man would have put, *"probably self-inflicted."* With that word inserted there, I would be absolutely satisfied with the paper.

The other statements in the proof of death upon this question were by persons who had absolutely no means of knowing whether it was suicide or not. Under the authorities above cited, it is plain that the burden of proof was upon the defendant to establish the fact of suicide. In addition to the rebuttal of the proofs of death aforesaid, plaintiff introduced evidence, showing absence of motive for suicide.

The question of the manner of death was one of fact for the deter- mination of the jury, and a verdict should not have been directed, if there was any substantial conflict in the evidence. We believe there was such a conflict, and the trial court was right in submitting the case. Judgment affirmed.