MUTUAL LIFE INSURANCE COMPANY OF NEW YORK

*v.* RAYMOND.

Opinion delivered April 2, 1928.

1. INSURANCE — BURDEN OF ESTABLISHING SUICIDE.—Where the defense to an action on a policy of life insurance is suicide, the insurer has the burden of establishing such defense by a preponderance of the evidence.

2. INSURANCE—JURY QUESTION.—In an action on a life insurance policy where the defense was suicide, and the evidence showed insured was comparatively young, was living happily with his wife and children, holding a position of honor and trust, and where there was no showing of a motive for suicide, and where there was no evidence to show how insured was killed, the question whether he committed suicide was for the jury.

3. EVIDENCE—PRESUMPTION AGAINST SUICIDE.—There is a presumption of law against a man's taking his own life intentionally, even where it is shown that he came to his death at his own hands; the law presuming that the death was accidental rather than suicidal.

4. INSURANCE—TESTIMONY TENDING TO REBUT SUICIDE.—In an action for the death of the insured, where the defense was suicide, testimony of the insured's wife as to a conversation with the insured regarding the payment of premiums on his life insurance, which tended to show that insured was not contemplating suicide, but was expecting to live at least past the next premium period, before which death occurred, *held* competent evidence.

5. TRIAL—INSTRUCTION AS TO SUFFICIENCY OF EVIDENCE.—In an action on a policy of insurance where the defense was suicide, an instruction that, for the jury to be justified in finding that the insured

committed suicide, there must be evidence from which the conclusion would be reasonable and probable and not merely speculative or conjectural, *held* not error.

6. TRIAL—INSTRUCTION—WEIGHT OF EVIDENCE.—In an action on a policy of insurance, where the defense is that insured committed suicide, an instruction that the jury had a right to consider insured's conduct prior to the shooting and any facts and circumstances which took place during his last illness tending to explain any motive, *held* not erroneous as being upon the weight of evidence.

Appeal from Woodruff Circuit Court, Central District; *W. D. Davenport,* Judge; affirmed.

*Owens & Ehrman* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*Roy D. Campbell,* for appellee.

McHANEY, J. Appellees are the widow and two daughters of George O. Raymond, deceased. On June 4, 1925, each of the appellants issued to said George O. Raymond a policy of life insurance in the sum of $1,000, with a double indemnity clause covering death by bodily injury through "external, violent and accidental means." The policy issued by the appellant, Mutual Life Insurance Company, designated appellee, Alice M. Raymond, as the beneficiary, and the policy of the Ætna Life Insurance Company designated the appellees, Mary F. and Johnnie E. Raymond, as his beneficiaries. On April 26, 1926, George O. Raymond came to his death from a pistol-shot wound, which all parties admit was self-inflicted, but they differ as to whether his death was by suicide or by accident—whether intentional or unintentional. Suicide, whether sane or insane, within one year after the date of said policies, was not a risk assumed by the appellants. Appellants having denied liability after proof of death, separate suits were instituted against them, but, the defense being the same, they were consolidated, tried together, separate judgments of $2,000 each, under the double indemnity clause, had, and they jointly prosecute this appeal to reverse such judgments.

Suicide being the defense relied upon by appellants, the law places upon them the burden of establishing this

fact by a preponderance of the evidence, which they undertook to do. The facts developed are substantially as follows:

The insured was a deputy for the county clerk and the circuit clerk, and had been during the year 1925, and up until the time of his death in 1926, his office being in the rear of the Bank of McCrory, McCrory being one of the county sites of Woodruff County. For two or three months prior to his death he had been drinking somewhat, but none of the witnesses testified that he had been drinking to excess. Some complaint had been made against him by one or two persons on his bond to the clerks that he was neglecting his duties by remaining away from his office too much, and on the morning of his death both the county and circuit clerks came to McCrory for the purpose of talking to him about these matters, and of checking over his accounts. Mr. Raymond was at home, ill. He had been suffering with what his physician thought was influenza for about two weeks, and on the morning in question, April 26, after the arrival of the clerks, one of his bondsmen called him on the telephone and advised him that the two clerks were there for a conference with him, and to check over his accounts, and requested him to come to his office, if he was able to do so, which he agreed to do. It appears that he had been taking medicine during the night, which necessitated his going to the toilet, a small wooden structure to the back of his house, twice before his death, being accompanied on both occasions by his wife. He had borrowed a pistol from a friend in McCrory, who had requested the return of same, and he had been cleaning the pistol with a handkerchief. Shortly after the telephone call he took the pistol, got in his car, and started to his office, but, after going a short distance, he returned, got out of his car, and again went to the toilet, in response to a call of nature, apparently, and a short time thereafter a shot was heard in the toilet, and a scream of pain was heard by his wife, who was at the time in the garden

near the toilet. His brother, Jack Raymond, and two other gentlemen immediately responded, being the first ones to him, and they found him sitting on the toilet with his trousers down, as if in the act of responding to a call of nature, slumped over, with this borrowed pistol and the handkerchief he had used in cleaning it lying between his feet. They found that he had been shot through the left breast, the bullet entering, according to the doctor, right under the heart and passed through his back, going through the body, whether straight through or not the doctor did not know. He was taken into his house, where he died shortly after the arrival of the physician. No powder-burns were found on his clothes. The toilet on which he was sitting had a metal lid, which had been elevated, and the bullet from his body passed through this lid near the top, and through the wall of the toilet, the bullet-hole in the seat covering being 13 inches above the seat, and in the wall one inch lower, which would tend to show that the bullet ranged slightly downward.

It was further shown that, during his illness, he got out his insurance policies, which he kept in the dresser drawer, and examined them. His wife stated that he and she read the policies together, including the suicide clause, and that he was familiar with this clause, and knew it was in the policies. Other members of the family saw him reading the policies and heard him discuss them with his wife. On cross-examination of Mrs. Raymond she was asked this question, and permitted to give the following answer, over appellants' objections and exceptions: "Q. I want you to tell the jury what, if anything, was said by your husband, when he was examining these policies, about paying the next premiums that came due? A. He told me that he was very sick, he was feeling awfully bad, and he didn't think he would ever be able to work any more, and he wanted his premiums to be kept up. He said, 'Wife, if I haven't the money when they come due, I have a friend who will help you out. They must

be kept up'." This conversation occurred three days before his death.

The undertaker who took charge of his body found two notes in his clothing which he wore at the time, both of which had been destroyed or been misplaced; one to J. C. McCrory, and the other to Senator Walter W. Raney, the undertaker. The note to McCrory, in substance, read: "Dear J. C. You have been good to me and my family. Good luck." In the note to Senator Raney he stated that he was sick, did not know whether he would get well, and, if not, for him to take charge of his body. Both McCrory and Raney were warm personal friends of the deceased, McCrory having loaned him money to send his two girls away to school.

It is also shown that he was overdrawn in a small amount at the bank. An examination of his accounts at the office of the county and circuit clerk disclosed no shortage, and nothing of a criminal nature. It was developed that some warrants of duplicate numbers had been issued, but on examination thereof by the county judge they were held to be valid, and were reissued.

Under the above state of facts, the appellants insist that the court should have directed a verdict in their favor. We do not agree with counsel in this contention. There is little or no dispute about the facts. As was said in *Grand Lodge A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742: "The only disputed question is whether the shot was accidental or an act of intentional self destruction. The burden of proving suicide was upon the defendant. It alleged that fact as a defense to the action, and must prove it, for, until that fact is established, liability of the defendant for the amount of the policy is clear.

"There is no dispute about the facts, which were susceptible of direct proof, but the case turns upon the conclusion to be drawn therefrom—whether or not they establish suicide indisputably. For, if the facts are such that men of reasonable intelligence may honestly draw

therefrom different conclusions on the question in dispute, then they were properly submitted to the jury for determination. Judges should not, under that state of the case, substitute their judgment for that of the jury." And, as was further said in the same case: "After careful consideration of the evidence we are of the opinion that this question was properly submitted to the jury, and that there was evidence sufficient to support the verdict. Conceding that the theory of death by suicide finds more rational support in the facts established by direct proof than the theory of death by accident—that there is greater probability from the evidence that death resulted from a suicidal act than an accident—still we cannot say that death by suicide is the only reasonable conclusion to be drawn from the evidence. The proof does not exclude with reasonable certainty death from accidental shooting, and, the burden being upon the defendant to establish the defense by proof, it was properly left to the jury to say whether or not it was a case of suicide."

In that case the universal rule was again announced that there is a presumption of law against a man's taking his own life intentionally, even where it is shown that he came to his death at his own hands. The law presumes rather that the death was accidental instead of suicidal. This presumption of law is strengthened in the case at bar by the fact that he was a comparatively young man, 42 years of age, living happily with his wife and children, holding a position of honor and trust, being a deputy for two of the county's officials; that, while he was suffering from an illness prior to the day of his death, he had discussed with his family his insurance policies, and his desire the keep the premiums paid; that, in response to the telephone call, he had started to his office to consult with his employers, taking with him the borrowed pistol, when he was overcome by a call of nature, and suddenly returned to his home to answer it; the seating of himself and so arranging his clothes to answer such

call, no doubt taking the pistol out of his pocket in order to prevent it from falling on the floor while sitting upon the toilet. No one knows just how the fatal shot happened to be inflicted, whether he was again polishing the gun with the handkerchief he had formerly used, and accidentally discharged it, or whether it might have fallen on the floor and was discharged in such a manner as to receive the bullet in his breast, where it was deflected by a bone and passed straight through his body, or whether he deliberately shot himself, no one can tell. It would seem unreasonable to believe, or at least it would be improbable, that he would take his life intentionally in the place where he was and in the undressed condition in which he was found. It was therefore not impossible, nor even improbable, that the shooting of himself was accidental. We fail to find in the evidence any motive for suicide. The notes that were found in his clothing may be explained without reference to suicide. Taking into consideration his condition of health, his idea that he might not get well, might not be able to work any more, and all the facts and circumstances surrounding him at the time, we are unable to say that men of reasonable intelligence might not honestly draw therefrom different conclusions on whether his death was suicidal or otherwise.

The facts in this case are wholly different from those in *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831; *Ætna Life Ins. Co.* v. *Alsobrook,* 175 Ark. 523, 299 S. W. 744; and *Fidelity Mutual Life Ins. Co.* v. *Wilson,* 175 Ark. 1094, 2 S. W. (2d) 80, in which cases it was held that the undisputed facts unmistakably pointed to suicide, and the death could not be accounted for upon any other reasonable hypothesis than that of suicide.

It is next insisted that the court erred in permitting Mrs. Raymond to testify, as above set out, regarding her conversation with the deceased about the payment of premiums. It is said that this testimony is hearsay, and for that reason inadmissible, and, being highly prej-

udicial, calls for a reversal of the case. We cannot agree with this contention, for the reason that it seems to us that any testimony which tends to throw light upon the question at issue, that is, whether the deceased committed suicide, or came to his death by accidental means, is relevant and competent. His statements regarding the payment of premiums on these policies to his wife tended to show that at that time he was not contemplating suicide, but, on the contrary, was expecting to live at least past the next premium period, which was June 4 following, and was therefore competent for this purpose.

In the case of *Scott* v. *Sovereign Camp W. O. W.*, 149 Ia. 562, 129 N. W. 302, the Supreme Court of Iowa held that, on the issue whether a member of a fraternal beneficiary association committed suicide, evidence of his conversation over the telephone with his daughter, shortly before his death, to the effect that he would return home soon, in time to keep an engagement, that there were some clients in his office at the time, was admissible, as bearing on his apparent state of mind, contradicting the theory of suicide. And in an extensive note to *Rosman* v. *Travelers' Ins. Co.*, 127 Md. 689, 96 A. 875, Ann. Cas. 1918C, p. 1050, it is said: .

"In like manner declarations of an insured shortly before his death have been held in recent cases to be admissible to refute an inference that he committed suicide. Thus, in *Woodmen of World* v. *Wright*, 7 Ala. App. 255, 60 So. 1006, declarations made by the insured, who had shot himself, manifesting a hope or desire to recover, were held to be admissible 'for the purpose of showing whether or not the act was intentional.' So in *Messersmith* v. *Supreme Lodge, etc.*, 31 N. D. 163, 153 N. W. 989, proof that, shortly before his death, the insured stated that he was going to the house to fix the fire and would then come back for his wife and baby, was held to be admissible to rebut evidence of suicide."

In *Brawner* v. *Royal Indemnity Co.* (C. C. A.), 246 Fed. 637, it was held that statements of the insured tend-

ing to show a disposition to commit suicide made some months before his death were held to be admissible. The court said:

"The fact that threats or intimations of suicide were made some time prior to the death in question does not make evidence of them inadmissible, when it is fairly inferable from circumstances disclosed that, immediately prior to the death, the deceased was subjected to a depressing influence which was the same as or similar to the one by which he was affected when, not very long before, the incidents testified to occurred. As above stated, it was inferable from other evidence adduced in the instant case that the cause of the gloomy and despondent mood or state of mind, as to manifestations of which the witness referred to testified, had not ceased to exist at the time of Brawner's death. This being so, the conclusion is that those incidents are not to be regarded as being too far removed in point of time and sequence from his death to justify the consideration of them in connection with other circumstances throwing light upon the question of his death being accidental or suicidal."

And in the case of *Benjamin* v. *District Grand Lodge No. 4*, 171 Cal. 260, 152 Pac. 731, statements of the deceased showing intent to commit suicide, made seven months before the time of death, were held to be admissible. The court held that their remoteness went to their weight and not to their admissibility. An examination of the authorities discloses that the tendency of courts, in recent times at least, is to hold that any evidence, including statements of the deceased, which tends to throw light upon the question of whether the deceased came to his death by suicide or not, is competent. We therefore hold that there was no error in permitting Mrs. Raymond to testify as above set out.

It is next said that instruction No. 3, given at the request of the appellees, was improper. It is as follows:

"In attempting to determine whether or not the said George Raymond committed suicide, you would be

authorized to take into consideration all of the proved facts and circumstances which have been testified to in this case. Before you would be justified in finding that he did commit suicide, there must be evidence from which a conclusion would be reasonable and probable, and not merely speculative or conjectural. If you find from a consideration of all the evidence in this case that it is merely speculative or conjectural as to whether the said George Raymond committed suicide, your verdict should be for the plaintiffs."

It is objected to because it contains the words "speculative" and "conjectural," and the court was asked to strike this clause from the instruction. It is said that the instruction is erroneous because it permits the jury to apply a test of law, which is the proper function of the court. This same instruction was used and similarly criticised in the case of *Benefit Association of Railway Employees* v. *Jacklin,* 173 Ark. 937, 294 S. W. 353, and the court there held it to be a proper instruction. It would serve no useful purpose to make the same argument again, and we therefore overrule appellants' contention in this regard.

It is finally contended that instruction No. 8 was erroneous. It follows:

"In passing upon the question of whether or not the deceased, George Raymond, shot himself accidentally or intentionally, you have a right to consider all the facts and circumstances leading up to and surrounding the fatal shooting. You have a right to consider the conduct of the deceased prior to the shooting, any facts and circumstances which took place during his last illness which may tend to explain any motive in his mind, that might or might not explain the shooting, and you are to pass upon the facts and circumstances in the light of reason and common sense."

It is said that the last clause in this instruction particularly emphasizes certain portions of the testimony, and for that reason is an instruction upon the

weight of the evidence, which trial courts may not give. We do not think this instruction is open to this criticism. What we have already said relative to the assignment of error relating to the testimony of Mrs. Raymond has some application here.   The court did not tell the jury to take into consideration any particular testimony in the case, but, in effect, told the jury to take into consideration all of the facts and circumstances surrounding his death, and those during his last illness, any facts which might or might not tend to explain the shooting.   We think this was a correct instruction, and was no more than instruction No. 8 given at the request of appellants, by which the jury was told that, "in determining whether or not the insured committed suicide, you will consider all the facts and circumstances surrounding Raymond's death; the nature of the wound, the position of the body, and all the circumstances which might explain the cause of his death."   It appears to us that this last instruction is more nearly subject to the criticism appellants have made of the other instruction.   However, we regard them both as correct statements of law for the jury's guidance.

We find no error, and the judgment is affirmed.