NEW YORK LIFE INSURANCE COMPANY v. WATTERS.

Opinion delivered July 3, 1922.

1. INSURANCE—PRESUMPTION AGAINST SUICIDE.—In an action on a life insurance policy in which suicide was an excepted risk, self-inflicted death is presumed to have been accidental until the contrary is made to appear.

2. INSURANCE—EVIDENCE OF SUICIDE.—In an action on life insurance policies in which suicide was an excepted risk, evidence *held* to establish a case of suicide.

Appeal from Pulaski Circuit Court, Second Division; *Archie F. House,* Judge; reversed.

*Rose, Hemingway, Cantrell & Loughborough,* for appellants.

A verdict should have been directed in appellants' favor, as the undisputed physical facts and circumstances eliminated every other reasonable theory than that the wound was intentionally self-inflicted. 95 Ark. 456; 182 N. W. 808; 146 S. W. 461 (Mo.); 117 S. W. 788 (Tex.).

*Coleman, Robinson & House* and *Hendricks & Snodgress,* for appellee.

When appellants complain of the refusal of the court to direct a verdict in their favor, they seem to overlook the following cases, in which there was a stronger pre-

sumption of suicide than in the present one, wherein the court refused to disturb a verdict returned by the jury. *Guardian Life Ins. Co.* v. *Dixon,* 152 Ark. 597; 80 Ark. 190; 113 Ark. 504; 221 S. W. 858.

HUMPHREYS, J.  Separate suits were instituted by appellee against appellants in the Pulaski Circuit Court upon life insurance policies issued by each to her husband, in which she was named as the beneficiary. The defense interposed to each suit was that the insured committed suicide, which was an excepted risk. The causes were consolidated by agreement and submitted to a jury upon the pleadings, evidence, and instructions, which resulted in a verdict and separate judgments against each appellant in favor of appellee, from which is this appeal.

At the conclusion of the testimony appellants requested the court to instruct a verdict for them, which was refused, over their objection and exception.

Appellant's main contention for reversal is that the undisputed evidence clearly established that the insured committed suicide, and overcame the presumption of an accidental killing. The law applicable in this class of cases, gleaned from an array of authority, was very plainly and tersely enunciated in the case of *Grand Lodge of A. O. U. W.* v. *Bannister,* 80 Ark. 190, in the following language: "In the first place, there is a presumption against suicide or death by any other unlawful act, and this presumption arises even where it is shown by proof that death was self-inflicted; it is presumed to have been accidental until the contrary is made to appear. This rule is founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being." In quoting and applying this rule to the facts in the case of *Industrial Mutual Indemnity Co.* v. *Watt,* 95 Ark. 456, this court said: "Hence we see that if reasonable men, viewing the facts, which are undisputed, might come to different conclusions as to whether the deceased commit-

ted suicide, then the facts, although undisputed, were properly submitted to the jury.'' With the rule itself in mind, and the rule last quoted as a guide for the application thereof, after a careful consideration of the facts and circumstances in the instant case, we are unable to account for the death of the insured upon any other reasonable hypothesis than suicide. The record reveals that the insured was the head of a family consisting of his wife and two children. The family were devoted to each other and lived together happily. Until the latter part of September, 1920, he had been superintendent of the bauxite mining operations in Pulaski County of the Republic Mining & Manufacturing Company, at a good salary. He was succeeded by John T. Fuller, but was continued in the employ of the company during October, after which he was promised a vacation for two months on full salary, so that he might have an opportunity to seek other employment. He had been in the employ of the company since 1907, and had purchased a home in Little Rock. He was an old friend of the president of the company, who proffered assistance in getting him another position, and who agreed to pay the expenses of the move should he sell his home in Little Rock and return to Georgia, from whence he came. According to the preponderance of the testimony, he was not despondent over the loss of his position. Naturally he was of a happy disposition. Nothing in his conversation or conduct in the past indicated that he contemplated suicide. He slept well the night before his death, and left home for the mines in his usual good humor, after joking and playing with the children. Being pay-day at the mines, he carried his pistol, according to custom. Such acquaintances as he met observed nothing unnatural about him. In the suburbs of the city he stopped at a negro garage to have his car repaired. He was in his usual happy frame of mind. He went behind the garage, remained there for a short time, returned and asked if his car was ready, complained of his stomach, and step-

ped behind the garage again. Almost immediately thereafter, while standing, seemingly in a leaning position against the house, his pistol fired. William Oliver, who was passing the garage just before the pistol fired, observed that the insured, who was standing in the rear of the garage, had on a gray cap. Just as the pistol fired he looked and observed the man still standing up and saw the cap shake just as one would see a shadow. When those near hurriedly reached the place of the tragedy the insured was lying on the ground and his pistol, a Savage automatic .32, was by his side. The ball had entered the right temple back of and about one-half inch above the right eyebrow, passed through his head almost on a level, and came out of the left temple at a point slightly higher than the point of entry. The powder-burn covered a space of about four inches, indicating, according to the expert evidence, that the point of the pistol was from nine to sixteen inches from the head of the deceased when it fired. Gus Leimer testified that such a pistol might be accidentally discharged.

Reasoning upon the undisputed physical facts in the case, we are unable to evolve any reasonable theory by which the insured could have been accidentally shot. He was standing when the pistol fired. The course of the ball was approximately straight through the head from temple to temple. Had the pistol accidentally dropped and fired either before or after it hit the ground, and if the ball had taken an upward course, it could not have passed on a level through a standing man's head and have left powder-burns on the place of entry. Had the insured been examining or handling the pistol for ordinary purposes, and same had accidentally discharged, the ball would have necessarily entered the body from the front. The physical facts are not consistent with any reasonable theory of an accidental killing of which we can conceive. We are unable to reconcile them with any manner of killing except suicide. Learned counsel for appellee content themselves with relying on the pre-

sumption of accidental death, and do not suggest the particular manner in which it might have occurred.   The entry and exit of the bullet, the powder-burn, and the standing position of the man, unerringly indicate that at the time the pistol fired it was in the hand of the insured and pointed directly at his right temple.   This being the case, the purpose must have been suicidal.   There is no suggestion in the record of any fact from which a reasonable inference might be drawn that the insured met his death through foul play.   The case seems to have been fully developed, and, as the presumption of an accidental killing was overcome by the undisputed facts and circumstances, the court should have instructed a verdict for appellants.

The judgments are reversed and the cases dismissed.