FIDELITY MUTUAL LIFE INSURANCE COMPANY v. WILSON.

Opinion delivered January 16, 1928.

1. INSURANCE—PRESUMPTION AGAINST SUICIDE.—In an action on a life insurance policy where the insurer alleges as a defense that the insured committed suicide, the burden is on the insurer to establish that fact, since the law presumes that the insured did not commit suicide.

2. INSURANCE—EVIDENCE OF SUICIDE.—In an action on a life insurance policy where the evidence established that deceased was

killed by a gunshot wound in the mouth, inflicted in a locked hotel room, subsequent to period of treatment at the hospital for excessive drinking, *held* to disprove an accidental killing or murder, and to show conclusively that insured committed suicide.

Appeal from Clark Circuit Court; *James H. McCollum,* Judge; reversed.

*Joe Hardage* and *Rose, Hemingway, Cantrell & Loughborough,* for appellant.

*McMillan & McMillan,* for appellee.

MEHAFFY, J.   The appellant, on the 29th day of July, 1924, issued a life insurance policy to Howell D. Wilson in the sum of $1,000 if he died from natural causes, and $2,000 if he died from violent or accidental means, payable to his mother, Marie E. Wilson.   The policy contained the following clause:

"In case of self-destruction within two years from date of this policy, whether the insured be sane or insane, or if the insured shall die within two years from date hereof as a result, directly or indirectly, of participating in aeronautics or submarine expeditions or operations, then the insurance under this policy shall be a sum equal to premiums herein which have been paid to and received by the company, and no more."

The insured died from a pistol-shot wound in the mouth, in the city of Washington, D. C., on the 21st day of June, 1925, while a guest in the Burlington Hotel. The insurance company defended on the ground that he committed suicide.   The plaintiff maintained that he came to his death either accidentally or by a shot from some person unknown.

There was a jury trial, and a verdict returned in favor of the appellee against the appellant for $2,000, and 6 per cent. interest from December 12, 1925, and a judgment for said amount, and, in addition thereto, a judgment for $200 as attorney's fees, and $240 damages and costs.

Motion for a new trial was filed and overruled, and appeal taken to this court.   And, as stated by appellee, the sole question now is, is the verdict of the jury so

wholly unsupported by evidence that this court can say that the jury were not warranted in declining to draw the inference that Wilson's death was intentionally self-inflicted? Or, in other words, whether Wilson committed suicide, or whether he was shot accidentally, or shot by some person unknown.

The facts are substantially as follows: Howell D. Wilson was, on the 25th day of May, 1925, confined in the Gallinger Memorial Hospital in Washington, D. C., and remained there under treatment until June 19, 1925, when he was discharged. On the same day that he was discharged from the hospital he went to the Burlington Hotel, in Washington, D. C., and procured a room, and remained there until the 21st day of June, 1925. A telegram came for him, and the bell-boy tried to deliver it, and discovered that his door was locked, and he did not answer the telephone nor the knocks on the door. The bell-boy notified the hotel manager, and the door to the room he occupied was opened, the outer door opened with a latchkey, and the other door was shoved open, one of the beds having been placed against this door. When they entered the room occupied by Wilson he was found on the bed, dead, with a wound in his head. He had been shot through the mouth, and the ball came out on the back part of his head. There was blood on the bed and pillows, but nothing in the room was disarranged, except the bed being against the door. The pistol was on the bed, about three inches from deceased's right hand.

The room occupied by Wilson could be entered from the hall, or from the balcony if the windows or doors were open. Nothing unusual was noticed about Wilson's appearance when he registered at the hotel. On the outside of his door was a card with the words, "Do not Disturb." There were no powder-burns on his face or lips, and no wounds.

There was considerable testimony by experts about powder-burns and wounds when the gun was held close to the person who was shot, but no one seemed to have

had any experience or to.know anything about the effect when shot in the mouth. That is, as to whether you could see powder-burns or wounds if one was shot in the mouth, and whether the blood would prevent seeing them.   However, no one examined to see what the condition of the mouth was.   They only knew that the bullet entered the mouth and came out at the back of the head.

Wilson formerly lived at Arkadelphia, and a number of persons testified about his habits and character while he lived there, and the substance of this evidence was that there was nothing unusual about his character, and that he was not depressed or of a gloomy or morose disposition, but, on the other hand, had a sunny disposition, and there was nothing to indicate that. he might commit suicide.

A number of witnesses who examined the body in Washington, D. C., testified that he had been drinking, that he had delirium tremens, and was confined in the hospital from the 25th day of May to the 19th day of June, 1925, and that he was very much concerned about whether or not his mother would find out that he had been confined in this institution, and stated that he was afraid that it would kill her if she did find it out.

There was some conflict in the testimony as to whether he was dressed or undressed when found, and about where the bullet came out of his head.   There was no dispute, however, about the pistol having been fired in his mouth.

Wilson had demanded his release, although the doctor suggested that he remain in the institution until some of the representatives of the firm that he was with in New York should come.

As we have stated, he was shot in the mouth, and there were no wounds or powder-burns on his face or lips.

Appellee says in her brief:   "The sole question now is, is the verdict of the jury so wholly unsupported by evidence that this court can say that the jury were not

warranted in declining to draw the inference that Wilson's death was intentionally self-inflicted?''

Appellee is correct in this statement. The only question is whether Howell D. Wilson committed suicide, and, as stated by appellee, there is a presumption against suicide. If the circumstances under which one came to his death are such that it may have resulted from suicide, and the insurer alleges that fact as a defense, the burden is on it to establish that fact, for the law presumes the insured did not intentionally take his own life.

''And, while in an action on an accident policy the burden is on the plaintiff to show that death was caused by an accident, yet, where it is doubtful from the evidence whether death was caused by accident or by suicide, a presumption arises that an accident and not suicide was the cause of the death. * * * The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption.'' 14 R. C. L. 1236-7.

Among the most important things to be considered in determining whether the death of the insured was caused by suicide are the presence or absence of a motive, physical facts surrounding death, as the place where the body is found, its position, the presence or absence of powder-marks where death was caused by a pistol, the habits and temperament of the insured, and his environment.

Appellee contends, and correctly, that there is a presumption against suicide, and that such presumption stands until overthrown by evidence in favor of the insurer, and calls attention to the case of *Grand Lodge of A. O. U. W.* v. *Bannister,* 80 Ark. 190, 96 S. W. 742, and the court in that case said, after speaking of the presumption against suicide and stating that the rule was founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being, states:

"This presumption is greatly strengthened in this case by proof as to the habits and character of deceased. He was sober, industrious, and religiously inclined. He was married, and lived happily with his wife, and had never, so far as the proof shows, said or done anything indicating a suicidal tendency, but, on the contrary, almost his last utterance expressed his plans to pursue the even tenor of his life. He went to bed, after preparing himself as usual for a night's rest, and apparently fell asleep.   *   *   *   It is not impossible, nor even improbable, that the shooting was accidental. He had a self-acting revolver under his pillow, which he always kept there. He was very nervous and excitable, wakeful, and easily alarmed at night. He may have been suddenly aroused by some noise, grasped the pistol, and, in a half-awakened state, pulled the trigger as he drew the pistol from beneath the pillow. This is neither impossible nor improbable, though, as already stated, it may be more probable that the shooting occurred from design, and we do not, under those circumstances, feel justified in setting aside the conclusion reached by the jury and substituting our own as to the cause of death."

Wilson, as shown by the evidence, was not only not sober, but had been drinking to such an extent that he had delirium tremens. He was confined in the hospital for nearly a month. He was depressed, and very much concerned whether his mother should hear of his confinement in this institution, stating that, if she did learn of it, it might kill her. He had just been discharged from the hospital, but was still nervous and depressed, according to the testimony of one of the doctors who saw him after he had been discharged. He went to his room at the hotel and locked one of the doors, or, at any rate, it was found locked, and the bed was found placed up against the other door. The wound was in his mouth. It must have been made by placing the barrel of the pistol in his mouth, because there is no showing of any blood or powder-burn on his face or lips. We think it impossible

that the wound could have been by accident or have been by any person other than Wilson himself.

The appellee next calls attention to the case of *Ætna Life Ins. Co.* v. *Taylor,* 128 Ark. 155, 193 S. W. 540, Ann. Cas. 1918B 1122. In that case the insured was found dead as the result of a gunshot wound through his head, but the bullet went into his head about an inch in front and about the right eye and came out about an inch and one-half above and behind the left ear. There were no powder-marks or burns of any nature on his body. His flesh was not charred or his hair singed. The pistol had been fired twice.

The court in the last case mentioned states the general rule with reference to presumptions against suicide, and cites the case of *Grand Lodge A. O. U. W.* v. *Bannister,* and simply holds that the verdict of the jury in that case was proper; that is, that the court did not commit reversible error in giving the instructions, one of which told them they would find for the plaintiff if the evidence showed that death resulted from a shot fired by some person other than the plaintiff. The jury could very well have found this in that case. He was shot in the head, the bullet entering about an inch in front and above the right eye, and there were no powder-burns and nothing to indicate that the gun was held by himself close enough so as to show marks or powder-burns on his face. It was a question of fact for the jury to determine whether he committed suicide or whether he was killed by some other person.

But, in the present case, the facts are wholly different. The facts are such that we think fair-minded men, after an examination of all the testimony, could not reach any conclusion other than that the deceased, Wilson, put the pistol in his mouth and fired the shot. This is shown not only by the fact that there were no powder-burns on his face nor wounds on his face, that the pistol was fired in his mouth, but also by the fact that he had been suffering from delirium tremens, was wounded in

his mouth, that he had been in the hospital, and was depressed, the doors of his room were locked, and we think these things show conclusively that deceased committed suicide. To be sure, there is a possibility that some one could have got into his room, but there is no probability that any person got into his room and got a pistol in his mouth and fired without making any wounds on his face or leaving any powder-burns. In fact, from the evidence in this case, we think no conclusion can be reached other than that he committed suicide.

The appellee calls attention also to the case of *Columbian Woodmen* v. *Matlock,* 144 Ark. 126, 221 S. W. 858. In that case, however, the company resisted payment of the policy on the ground that the insured had made false representations in regard to the use of intoxicating liquors when he obtained the policy sued on, and had become intemperate in the use of intoxicating liquors, when he had agreed that, in case of suicide, sane or insane, there should be due and payable only one-fifth of the value of the covenant. The court submitted to the jury in that case only the question of suicide. The insured had got a double-barrel shotgun and shot his wife in the face, but she afterwards recovered. And the deceased walked to a nearby door, and in a few seconds another shot was heard. And the deceased was shot in such a manner as to blow his chin and face away, and that the shot entered underneath his chin and ranged upward, slightly outward. This shot, even if fired by the deceased, could have been accidental. It was the same gun with which he had shot his wife. And the court, among other things, said, after announcing the rule as to presumption as to suicide:

"We are unable to say, as a matter of law, that the fatal shot was not fired as the result of some act, such as violently striking the gun against the floor, or striking it against some object; and, while it must be confessed that the theory of suicide does not appear more probable than any other theory, the question of probabilities is one addressed to the jury, and not to us."

We think the jury could well have found in that case that the company had not shown by a preponderance of the evidence that the deceased committed suicide. He may have struck the gun, as suggested by the court, and accidentally have killed himself. He may have stumbled or fallen. At any rate, there was sufficient evidence to submit the question to the jury as to whether he committed suicide or shot himself accidentally, and, since the jury found that he did not commit suicide, their verdict was permitted to stand, although the court said that the theory of suicide appeared more probable than any other theory.

The difference between that case and the one at bar is that Wilson was not shot accidentally. Nobody, we think, could reach the conclusion that he had accidentally put the gun in his mouth and pulled the trigger, and there is no evidence upon which a verdict could be based that he either killed himself accidentally or was shot by some other person.

The next case referred to by appellee is *Watkins* v. *Reliance Life Ins. Co.*, 152 Ark. 12, 238 S. W. 10. This case was reversed because the court admitted improper testimony.

Appellee argues that the jury could have found from the testimony of appellant's witnesses that Wilson had no desire to take his own life. But, even if this is true, the jury could not have found from the testimony of all the witnesses that he was either killed by some other person or that he accidentally killed himself. Appellee also says that the jury may have declined to adopt the opinion of some of the witnesses. That may be answered by saying if they refused to adopt the opinion of any witnesses they could not have returned the verdict against the insurance company in this case, unless they declined to adopt not only the opinion of the witnesses but declined to consider the testimony that was undisputed and the physical facts which, as we have already said, show conclusively that he committed suicide.

It is next contended by the appellee that Wilson could have been murdered. There is no testimony in the case upon which such a finding could be based, and, if the jury had found that he had been murdered, the finding would not only have been without testimony to sustain it, but it would have been against all the testimony tending to show how he was killed.

This court has said: "Hence we say that, if reasonable men, viewing the facts which are undisputed, might come to different conclusions as to whether the deceased committed suicide, then the facts, although undisputed, were properly submitted to the jury." *New York Life Ins. Co.* v. *Waters,* 154 Ark. 569, 243 S. W. 831.

The undisputed facts in the Matlock case were submitted to the jury because, after he shot his wife, he walked to a door, and there was no possible way of knowing just how he came to shoot himself, whether it was accidental or whether he committed suicide, and it was proper to submit the facts to the jury. But, in the case of *N. Y. Life Ins. Co.* v. *Waters,* it was also said:

"Reasoning upon the undisputed physical facts in the case, we are unable to evolve any reasonable theory by which the insured could have been accidentally shot. He was standing when the pistol fired. The course of the ball was approximately straight through the head from temple to temple. Had the pistol accidentally dropped, and fired either before or after it hit the ground, and if the ball had taken an upward course, it could not have passed on a level through a standing man's head, and have left powder-burns on the place of entry. * * * The physical facts are not consistent with any reasonable theory of an accidental killing of which we can conceive. We are unable to reconcile them with any manner of killing except suicide."

And we think that in this case the physical facts are not consistent with any reasonable theory either of accidental killing or of being killed by some third person. We are unable to reconcile them with any manner of killing except suicide.

This court, on November 21, 1927, decided the case of *Ætna Life Ins. Co.* v. *Alsobrook, ante* p. 523, in which the defense interposed by the insurance company was suicide. In that case the deceased was shot in the mouth with a shotgun. The shot ranged through the roof of the mouth toward the back of the head without any visible powder-burns on his face anywhere. The skull was torn to pieces by the shot, and one of his front teeth was missing. On examination it was found that he was shot by a gun that he had borrowed, the barrel of the gun being about 28 inches in length. It could not be told whether the roof of the mouth showed powder-burns, on account of the excessive amount of blood. But in that case it was shown that Alsobrook was a man of happy disposition, and the witnesses who saw him on that morning agreed that he showed no signs of worry or trouble. Testimony showed that powder from a gun like the one he was shot with would make powder-burns anywhere from six to eight feet from the muzzle of the gun, and there were no powder-burns found on his face.

The court there said:

"We think the undisputed evidence, in fact, all the evidence, clearly establishes the fact that the insured committed suicide, and that it overcame the presumption of law against suicide and the presumption that he was killed accidentally rather than by suicide."

The policy sued on here was issued on the 29th day of July, 1924, and provided for the payment of $1,000 if he died from natural causes and $2,000 if he died from violent and accidental means, payable to his mother, Marie E. Wilson. The policy also contained the following clause:

"In case of self-destruction within two years from the date of this policy, whether the insured be sane or insane, or if the insured shall die within two years from the date hereof as a result, directly or indirectly, of participating in aeronautics or submarine expeditions or operations, then the insurance under this policy shall be

a sum equal to premiums herein which have been paid to and received by the company, and no more."

It follows from what we have said that the insurance company is only liable under this policy for a sum equal to the premiums which have been paid to and received by the company.

The briefs of appellant and appellee contain a long list of authorities on the question involved in this case, but it is unnecessary to comment on them or cite them here further than we have.

This court has in recent cases followed the rule announced in the cases we have cited, and, under the facts in this case, there can be no liability except as set out above.

The case is therefore reversed, and remanded with directions to enter a judgment against the insurance company in a sum equal to the premiums which have been paid to and received by the company.