NEW YORK LIFE INSURANCE COMPANY *v.* REDMON.

4-4080

Opinion delivered December 16, 1935.

*James B. McDonough* and *Louis H. Cooke,* for appellant.

*Partain & Agee,* for appellee.

McHANEY, J. Appellee is the beneficiary in a policy of life insurance issued by appellant to her husband in the sum of $1,000. The policy provided for double indemnity in the event "that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means, and occurred within ninety days after such injury." Another clause in the policy provided: "Double indemnity shall not be payable if

the insured's death resulted from self-destruction, whether sane or insane." The insured died on January 16, 1934, while the policy was in full force and effect, under such circumstances as induced the appellant to believe that he committed suicide. It therefore declined to pay double indemnity, but did pay the principal sum of $1,000 under an agreement that such payment should not prejudice its rights. Appellee brought this action to recover an additional $1,000 under the double indemnity provisions above quoted, and a trial resulted in a verdict and judgment in her favor.

Appellant's principal contention for a reversal of the judgment against it is that the undisputed evidence shows that the deceased intentionally took his own life, and that the court, therefore, erred in refusing to direct a verdict in its favor at its request. The facts, briefly stated, are as follows: Mr. Redmon was the postmaster at Sallisaw, Oklahoma. On the morning of January 16, 1934, the day of his death, two post office inspectors appeared at said post office to examine his records and check up his accounts. Mr. Redmon, who was at the post office, was notified of their presence, met them, and they advised him of the object of their visit. They immediately entered upon their duties. One of them and Mr. Redmon entered the vault to get the records, books, papers, cash, stamps, etc., which they required in making the inspection. The other inspector busied himself at another desk. Immediately after coming out of the vault with the books and papers above mentioned, Mr. Redmon again went into the vault and very shortly thereafter a pistol shot was heard, and the employees and inspectors went to the door of the vault and found the deceased slumped down on the cement floor of the vault with a .45 caliber double action Colt's revolver lying near his right hand. Upon investigation they found that he had been shot, and that the bullet had entered his head just back of the right ear, near the top of the ear, or the middle of it, and had come out of his head about the edge of the hair a little above and back of his left eye. No one witnessed the shooting. The pistol was one of three in the post office belonging to the Government and furnished

to the office by the Government. It was approximately twelve inches long from the muzzle to the butt of the hilt. Concerning the character of the man, counsel for appellant in his brief makes this statement: "As in the Watters' case, the insured in the instant case was in a happy frame of mind. He was a church member, superintendent of Sunday School, postmaster in his town, and, according to those who testified, was a good citizen and an ideal man. His widow testified to his habits of saving and his habits of caring for his family, and his devotion to his family." The inspectors, on completing their check of his accounts, found that he was short in the sum of $1,098.75. No explanation was made concerning this shortage. The employees testified to a lack of knowledge regarding same. His accounts had been checked some eight or nine months previous to that time and were found to be in good order. No evidence was introduced by appellant to show any extraordinary use or expenditure of money by the deceased or what became of the money if he did in fact embezzle it. It was shown that, except for a debt of $100 to a bank, which was not yet due, he was not involved in debt. Except for the shortage in his accounts above-mentioned, there does not appear to have been established the slightest motive for suicide. The undisputed facts in this case show further that there were no powder burns found around the wound where the bullet entered, and that none were disclosed by probing the wound with cotton by the undertaker. No powder burns or carbon inside the wound were found; that it would be very awkward and difficult for Mr. Redmon to have held the pistol in his right hand at or near the point where the bullet entered, and for it to take the range it did take in passing through his head. It appears to us to be reasonable to assume that, had he done so, some visible evidence or powder burns would be shown, or at least a probe of the wound as was done would disclose such fact. When we consider the length of the pistol, and the awkward position in which it must have been held for a shot to be self-inflicted, it is rather remarkable that no powder burns were found, and it is a rather cogent circumstance against suicide. It is not contended by

appellee that any one else fired the shot, but only that it was accidental. It was not incumbent upon her to show how the accident happened. The burden was upon appellant to show that it was suicide. This fact is conceded, and it asked for and was given the right to open and close the case. When we remember that this was a double action pistol, one that could be fired by simply pulling the trigger, and when we remember that such a pistol may be and is frequently discharged accidentally, either by pulling the trigger or by falling, or by moving the pistol and accidentally striking the hammer against an object or in many other ways, we cannot say, as a matter of law, there was no case made for the jury.

The law of the case is well settled. In *Mutual Life Insurance Company of New York* v. *Raymond,* 176 Ark. 879, we quoted from *Grand Lodge A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742, the following: "The only disputed question is whether the shot was accidental or an act of intentional self-destruction. The burden of proving suicide was upon the defendant. It alleged that fact as a defense to the action, and must prove it, for, until that fact is established, liability of the defendant for the amount of the policy is clear.

"There is no dispute about the facts, which were susceptible of direct proof, but the case turns upon the conclusion to be drawn therefrom—whether or not they establish suicide indisputably. For, if the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, then they are properly submitted to the jury for determination. Judges should not, under that state of the case, substitute their judgment for that of the jury."

And as was further said in another quotation from the same case:

"After careful consideration of the evidence, we are of the opinion that this question was properly submitted to the jury, and that there was evidence sufficient to support the verdict. Conceding that the theory of death by suicide finds more rational support in the facts established by direct proof than the theory of death by accident—that there is greater probability from the

evidence that death resulted from a suicidal act than an accident—still we cannot say that death by suicide is the only reasonable conclusion to be drawn from the evidence. The proof does not exclude with reasonable certainty death from accidental shooting, and the burden being upon the defendant to establish the defense by proof, it was properly left to the jury to say whether or not it was a case of suicide."

It is conceded that there is a presumption of law against a man taking his own life intentionally, even though it be shown that he came to his death by his own hands, as the law presumes that the death was accidental instead of suicide. In this case, this presumption of law is strengthened by the fact that Mr. Redmon was a good citizen, a man of high standing in the community, living happily with his family, holding a position of honor and trust, not an extravagant man and not being indebted in any appreciable amount. The fact that he was short in his accounts may or may not have been due to his own misconduct. No one knows just how the fatal shot was inflicted, whether in moving the pistol from one place to another, it was accidentally discharged, or whether it may have fallen, striking the floor in such a way as to cause it to discharge. Such accidents frequently happen. It is of course difficult to understand just how he received the wound he did receive in such a way, but this, as we view it, was a question for the jury.

Counsel rely upon the cases of *New York Life Insurance Company* v. *Watters,* 154 Ark. 569, 243 S. W. 831; *Ætna Life Insurance Company* v. *Alsobrook,* 175 Ark. 523, 299 S. W. 744; *Fidelity Mutual Life Insurance Company* v. *Wilson,* 175 Ark. 1094, 2 S. W. (2d) 80. These are the same cases relied upon in the case of *Mutual Life Insurance Company* v. *Raymond, supra,* but, as we said in that case, the facts in the cited cases are wholly different, for it was held in those cases "that the undisputed facts unmistakably pointed to suicide, and the death could not be accounted for upon any other reasonable hypothesis than that of suicide."

Some argument is made on errors assigned in the refusal to give certain instructions. We do not discuss

these assignments in detail. It is sufficient to say that we have carefully examined the instructions given and refused, and we are of the opinion that the court fully and fairly instructed the jury as to the law of the case.

No error appearing, the judgment is affirmed.