MUTUAL LIFE INSURANCE COMPANY OF
NEW YORK *v.* STURDIVANT.

4-8928                                                222 S. W. 2d 812

Opinion delivered July 4, 1949.

Rehearing denied October 3, 1949.

698

*Chas. I. Evans, Louis W. Dawson* and *Moore, Burrow, Chowning & Mitchell,* for appellant.

*Chas. X. Williams* and *Leffel Gentry,* for appellee.

GEORGE ROSE SMITH, J. In the trial court the appellee recovered judgment in her action upon a $5,000 life insurance policy issued to her husband. Appellant defended on the ground that the insured committed suicide, a risk not covered by the policy. It is now urged that the jury's verdict is not supported by substantial evidence.

The plaintiff rested her case after proving that the policy was issued on November 13, 1947, and that the insured died about a month later, on December 11. No effort was made by the appellee to show how her husband met his death. The insurer's proof was so detailed that we have a substantially complete narrative of the events leading up to Sturdivant's death.

The insured was employed by a monument dealer in Fort Smith. He was trebly obligated to his employer, in that he was short in his accounts, had drawn part of his salary in advance, and had obtained his employer's endorsement upon a note which the latter had to pay after his employee's death. Sturdivant was indebted to several other people as well. Among his debts was a $1,300 note to a Booneville bank, the loan having been procured by Sturdivant's false representation that he owned a car which was mortgaged as security. He had opened a small bank account and written a number of worthless checks, some of which did not reach the bank until after

his death. Within the last few weeks of his life Sturdivant made several unsuccessful attempts to borrow additional funds.

The insured's health was impaired. He was subject to severe sinus headaches, for which his physician had prescribed a narcotic. The patient had also suffered hemorrhages of the lungs, suggesting the possibility of tuberculosis. A week before December 13 Sturdivant made an appointment for a chest x-ray on that date, but he did not live to keep the appointment.

Financial difficulties and bad health doubtless caused the periods of despondency that are reflected by the testimony. Sturdivant's mother, called as a witness by the insurer, testified that her son, a man of thirty-four, cried several times and read the Bible frequently during the last two weeks of his life. He told his mother that he was going to kill himself, and as a result his gun was taken from him as a precautionary measure. Sturdivant's brother corroborated the existence of these crying spells and despondency.

On the afternoon preceding his death Sturdivant bought a pistol, saying that there were prowlers in the vicinity of his home. He gave a bad check in payment for the gun. While in his brother-in-law's company he started to load the pistol and wept when he was forbidden to do so. At about dusk the insured drove his employer's truck to a filling station and bought gasoline. He showed the pistol to the attendant, an acquaintance, and said, "You may not see me any more, so remember how I looked the last time you saw me." This occurred in Paris, Arkansas, where the insured had lived until March of 1947.

In the early evening a Paris policeman saw Sturdivant driving the truck around the town square. About eight minutes later this officer, accompanied by a State trooper, was driving on the highway outside of town and noticed the truck on the side of the road. Sturdivant was found in a dying condition, slumped over the steering wheel. He had been shot just above the right ear, the

ball passing through his head and emerging slightly higher above his left ear. The bullet was embedded in the side of the cab, to the left of the driver's seat and from three to ten inches above the level where Sturdivant's head would normally have been. On the floor of the truck, a few inches from Sturdivant's right hand, lay the pistol, fully loaded except that one shell had been fired. There were powder burns, made at close range, on the insured's head around the wound and on both his hands. The officers investigated the possibility of a third person's having been on the scene but found no indication of any one else's presence.

In cases of this kind we have held that a verdict must be directed for the insurer if the evidence pointing to suicide is so conclusive that fair-minded men can reach no other conclusion. *Fidelity Mut. Life Ins. Co.* v. *Wilson,* 175 Ark. 1094, 2 S. W. 2d 80; *New York Life Ins. Co.* v. *Watters,* 154 Ark. 569, 243 S. W. 831. Here the only suggestion of accidental death is based on testimony that the insured's pistol was of a type that could have discharged if it were dropped and if the hammer struck the steering wheel or floor. But even if the jury were permitted to disregard arbitrarily the undisputed evidence of Sturdivant's financial straits, his bad health and expressed intention to take his own life, there is still no tenable hypothesis by which the physical facts can be reconciled with the notion of accidental death. If the insured held the pistol to his head with both hands and pulled the trigger, the position of the powder burns and the nearly horizontal trajectory of the bullet are readily explained. Appellee suggests that the same results might follow if the pistol had been dropped accidentally against the steering wheel. A manifest flaw in this theory is that if Sturdivant had been attempting to catch the falling weapon with both hands, his head would not have been so turned that the ball could have entered above his right ear and have followed the path it actually took. To reach such a position the insured would have had to lean forward and look upward over his left shoulder in the instant of grasping for an object that could have been falling for only a small fraction of a second. We can

only conclude that the verdict was based upon sympathy for the appellee rather than upon the evidence submitted to the jury.

Reversed and dismissed.