268 F.2d 149
 George L. DORTCH and Gwendolyn A. Bredlow, Appellants,
v.
NEW YORK LIFE INSURANCE COMPANY, Appellee.
NEW YORK LIFE INSURANCE COMPANY, Appellant,
v.
George L. DORTCH and Gwendolyn A. Bredlow, Appellees.
 Nos. 16052, 16053.
 United States Court of Appeals Eighth Circuit.
 June 19, 1959.
 
 Phillip Carroll, Little Rock, Ark. (Rose, Meek, House, Barron and Nash, Little Rock, Ark., were with him on the brief), for New York Life Ins. Co.
 William H. Bowen, Little Rock, Ark. (William L. Terry, Little Rock, Ark., was with him on the brief), for George L. Dortch and Gwendolyn A. Bredlow.
 Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 These appeals arise out of the issuance of two insurance policies by New York Life Insurance Company on the life of Reuben W. Bredlow, now deceased, and in which plaintiffs are the named beneficiaries. Diversity of citizenship and amounts involved supply the requirements for federal court jurisdiction.
 
 
 2
 Both policies provide for double indemnity benefits in the event that death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external violent and accidental causes or means.
 
 
 3
 George L. Dortch and Gwendolyn A. Bredlow, hereinafter referred to as plaintiffs, are the appellants in No. 16,052, in which the main question for determination is whether there was an adequate evidentiary basis to make the issue of suicide as opposed to accidental death one of fact for the jury. In No. 16,053, New York Life Insurance Company, hereinafter referred to as defendant, is the appellant. Its appeal asserts that in the event of a reversal in No. 16,052, which would sustain the jury's finding that the insured's death was accidental, a new trial should be granted because the trial court made numerous errors which should require the remanding of the case for a new trial.
 
 
 4
 Plaintiffs each filed proof of death claim with the defendant wherein death by accidental gunshot wound and double indemnity benefits were claimed. The defendant paid each of the plaintiffs $5,000.00, being the principal sum in each policy, but refused to recognize liability under the double indemnity clause. It asserted as an affirmative defense that death resulted from suicide or self-destruction. The cases were joined and tried to a jury November 5 and 6, 1957. The only question presented to the jury was whether the insured committed suicide. The jury returned a verdict for plaintiffs.
 
 
 5
 At the close of plaintiffs' case and at the close of the trial, the defendant had moved for a directed verdict in each case. On November 15, 1957, defendant filed a motion for judgment in accordance therewith and in the alternative moved for a new trial. On December 9, 1957, the trial court entered judgment in accordance with the jury verdict in each case in the amount of $6,618.76 (policy $5,000.00, statutory attorney's fees $750.00; 12% penalty and interest at 6% from November 6, 1957). Thereafter on December 16, 1957, the court heard argument on defendant's motion for judgment notwithstanding the verdict, or, alternatively, for a new trial.
 
 
 6
 Some months later, on April 28, 1958, the trial court entered an order directing judgment for defendant and denying the alternative request for a new trial. From this order plaintiffs filed notice of appeal on May 8, 1958, (case No. 16,052) and on May 15, 1958, defendant filed notice of appeal (case No. 16,053), from that portion of the April 28th order which held that the trial of the case was free from error and denying a new trial.
 
 
 7
 We will consider first case No. 16,052, involving the correctness of the court's order entering judgment notwithstanding the verdict. Both policies involved are Arkansas contracts so that we are herein governed by the substantive law of that state. In considering the question of the correctness of the court's order granting judgment notwithstanding the jury verdict, we must take that view of the evidence and the inferences reasonably deducible therefrom as will tend to support the jury verdicts.
 
 
 8
 We deem it necessary to set forth the evidence in some detail, bearing in mind the rule that unless reasonable minds could not disagree as to the ultimate facts the order of the District Court was in error and the judgment based on the jury verdicts must be reinstated. New York Life Ins. Co. v. Redmon, 1935, 191 Ark. 1003, 88 S.W.2d 324; Metropolitan Life Ins. Co. v. Graves, 1940, 201 Ark. 189, 143 S.W.2d 1102.
 
 
 9
 Reuben W. Bredlow, the insured, died at the age of 57 in Pulaski County, Arkansas, on November 11, 1956. He had been a long-time resident near a road intersection commonly known as Bredlow's Corner. Plaintiffs' evidence indicates that Bredlow was a farmer, owner of a cotton gin and of cattle, and was in good financial condition. He belonged to the North Little Rock Elks Club in which he was active and where he had many friends. Each day he spent considerable time at his office at Bredlow's Corner and on rainy days he enjoyed playing cards there with his friends. He was an avid Bible reader and would go to his office early each morning to read his Bible. His home life was normal and happy. He and his widow, one of the plaintiffs herein, had been married for 29 years. He idolized his daughter and grandchildren and was particularly fond of a granddaughter named Joe-Boy. For more than 20 years the deceased had been a somewhat heavy drinker. Nevertheless, he went on with his work and to those who worked with him it was not noticeable. About a year and a half before his death he began to taper off in his drinking habits and became interested in church, to which the Reverend Mr. Michael Carozza testified, 'He was making very good progress.'
 
 
 10
 The deceased was an avid outdoors man, getting much enjoyment out of hunting and fishing. Shortly before his death he cleared land and made roads to facilitate squirrel hunting on his property. The deer season opened the day following his death and he had made plans to go out on that day. The deceased and Mr. Carozza had planned a fishing trip to the Gulf Coast for the week-end following November 11th.
 
 
 11
 The deceased kept his guns at his office. Although he was an expert with the use of a gun, he was noted as being extremely careless with them. His guns were usually kept loaded and most of the time with the safeties off. Traveling to and from hunting he would place his guns loaded and undovered either on the seat or in the back of the truck. When drinking, he ahd been known to shoot between the legs of his friends.
 
 
 12
 The weapon with which the deceased was killed, his deer gun, was a Magnum 12-gauge Winchester pump with a 30-inch barrel. It was 4 feet 1 1/2 inches long and measured exactly 3 feet from the end of the barrel down to the curve of the trigger. This gun was always loaded and usually kept in a corner of the back room of his office. At the time of his death the deceased's 32 automatic pistol, with a clip full of bullets and one in chamber, was lying in the top left-hand drawer of his desk, the same desk upon which his Bible and glasses were found.
 
 
 13
 On October 8, 1956, the deceased had a physical check-up at a Little Rock, Arkansas, infirmary. It was determined that he was in a 'run-down condition' and that he should go to a hospital 'for the purpose of giving him rest'. While in the hospital he had sedatives, vitamins, tranquilizers, and male hormone therapy. The check-up revealed that he had a bundle branch block of the heart which he had apparently had for some time. His blood pressure was satisfactory. Upon discharge the doctor concluded that he was in a 'fairly good general condition'; and that 'If he will continue using a minimum amount of alcohol, adequate protein and vitamin intake and sedentary activities he will no doubt do very well.'
 
 
 14
 The day before his death, November 10th, the deceased spent considerable time in his office. That evening he had an enjoyable dinner with his wife, followed by a quiet evening at home watching television. He arose the next day about six o'clock. The evidence revealed that he was cheerful. He tried on the suit that he was going to wear to church that day. As was his custom, he went to his office to read the Sunday paper. Also according to custom, Mrs. Bredlow went to Sunday School, then to church, where she usually met her husband, who would come there from the office. Sometime before 10:30 a.m. Bredlow was killed by a charge of double 00 buckshot from his deer gun. He was found lying on his back in the back room of his office. His arms were alongside of his body and the death weapon between his legs, pointing toward his left side. The shot entered just under his chin and went straight up through the ceiling, hitting a light located in the room. He had powder burns on his neck. His glasses were lying on his desk, together with his Bible. In oral argument the defendant made point of the fact that he had left his Bible open at the Twenty-Third Psalm. In rebuttal plaintiffs' counsel presented the Bible for the court's inspection, directing attention to the fact that pages 504-505 (pages including the Twenty-Third Psalm) were more significantly yellowed or deteriorated than the other pages, indicating that Bredlow commonly left it open at that point.
 
 
 15
 The deceased left no will and made no preparation for the distribution of his estate; he left no letters or notes. The death gun had discharged accidentally before. It was dirty and needed cleaning, but there was no evidence that he was cleaning the gun at the time of the mishap. According to the views of both plaintiffs' and defendant's gun experts, it could have gone off accidentally.
 
 
 16
 Defendant's evidence, in support of its suicide theory, tended toward a conclusion contrary to that deducible from plaintiffs' evidence. It indicated that in the last two or three months prior to his death Bredlow became a changed man; that he didn't talk as much and had lost considerable weight; that he ahd formerly been an active man but he let things go too suddenly and did not have enough to keep him busy; that he seemed despondent and to have lost interest in hunting or fishing; that regardless of the fact that Mrs. Bredlow testified that he was a better man, she had made an appointment for him with a psychiatrist; that he did not keep the appointment because Mrs. Bredlow had changed her mind and cancelled it; that Bredlow had related to his colored blacksmith and mechanic, Madison Barnum, that there was something on his mind, he didn't know what; that there was something in front of him he couldn't touch, saying, "if I could touch it, I could snap out of it like that (snapped his finger). I can't touch it, I don't know what I'm going to do if I can't snap out of it."; that he said, "I may have to go to some mental institution and I don't want to go there, I want to stay on the corner, I don't want to have to leave the corner. (Referring to Bredlow's Corner). If I can't snap out of it, I don't know what will happen"; that on Saturday evening before the day of death Bredlow and Barnum were examining a defective heater in Bredlow's office; Bredlow said, "it smokes." 'And he said, 'Well, I won't need it any more no how because I won't be in here"; that a relative by marriage who, together with his wife, appeared on unfriendly terms with the deceased's widow, noted that Bredlow was not as happy as usual, that he seemed to have lost interest, that he was restless, that the day before his death Bredlow talked with this witness and his wife, discussing the low price of cattle and Bredlow said, "Don't let me get too cold." '* * * 'I feel like blowing my top off"; that he said, "If anything happens to me, you will take care of Mama, won't you?"; that he had $2,000.00 at the Elks Club and said, "see that I get a decent burial." A lawsuit over cattle was pending between this witness and Mrs. Bredlow and there was evidence to the effect that the witness said he would contact the insurance company 'and tell them everything he could think of to keep her from getting any money' and that he made this statement several different times, all of which the jury could consider in weighing his credibility.
 
 
 17
 The Supreme Court of Arkansas, by whose opinions we are bound herein, has had numerous occasions on which to state the law of Arkansas as it is applicable to the problem with which the court was confronted herein. In a much quoted, early 'landmark case', Grand Lodge A.O.U.W. v. Banister, 1906, 80 Ark. 190, 96 S.W. 742, 743-744, the Arkansas Court stated:
 
 
 18
 'The chief insistence of counsel for appellant as ground for reversal is that the verdict is without evidence to support it, that the undisputed evidence shows that Banister came to his death by his own suicidal act, and that the trial court erred in not peremptorily instructing the jury to return a verdict in favor of the defendant. It is conceded that Banister's death was the result of a shot from a pistol held in his own hand. While no one saw him when the shot was fired, all the circumstances point with certainty to the conclusion that no other person could have fired the shot. The only disputed question is whether the shot was accidental or an act of intentional self-destruction. The burden of proving suicide was upon the defendant. It alleged that fact as a defense to the action, and must prove it; for until that fact is established liability of the defendant for the amount of the policy is clear. There is no dispute about the facts which were susceptible of direct proof, but the case turns upon the conclusion to be drawn therefrom-- whether or not they establish suicide indisputably; for, if the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, then they were properly submitted to the jury for determination. Judges should not, under that state of the case, substitute their judgment for that of the jury. St. Louis, I.M. & S. Railway Co. v. Martin, 61 Ark. 549, 33 S.W. 1070. After careful consideration of the evidence we are of the opinion that this question was properly submitted to the jury, and that there was evidence sufficient to support the verdict. Conceding that the theory of death by suicide finds more rational support in the facts established by direct proof than the theory of death by accident-- that there is greater probability from the evidence that death resulted from a suicidal act than an accident-- still we cannot say that death by suicide is the only reasonable conclusion to be drawn from the evidence. The proof does not exclude with reasonable certainty death from accidental shooting, and, the burden being upon the defendant to establish the defense by proof, it was properly left to the jury to say whether or not it was a case of suicide.
 
 
 19
 'In the first place, there is a presumption against suicide or death by any other unlawful act, and this presumption arises even where it is shown by proof that death was selfinflicted. It is presumed to have been accidental until the contrary is made to appear. This rule is founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being. (Cases cited.)'
 
 
 20
 In 1953 the Supreme Court of Arkansas had before it a similar question in New York Life Ins. Co. v. Thweatt, 1953, 221 Ark. 478, 254 S.W.2d 68, 70-71, wherein it stated:
 
 
 21
 'We have followed the rule of the Banister case in our subsequent cases: sustaining the suicide defense in such cases as New York Life Ins. Co. v. Watters, 1922, 154 Ark. 569, 243 S.W. 831; Fidelity Mutual Life Ins. Co. v. Wilson, 1928, 175 Ark. 1094, 2 S.W.2d 80; Mutual Life Ins. Co. of New York v. Sturdivant, 215 Ark. 697, 222 S.W.2d 812; and refusing the suicide defense in such cases as Aetna Life Ins. Co. v. Taylor, 1917, 128 Ark. 155, 193 S.W. 540, Ann.Cas.1918B, 1122; New York Life Ins. Co. v. Redmon, 1935, 191 Ark. 1003, 88 S.W.2d 324; and Continental Cas. Co. v. Speer, 215 Ark. 174, 219 S.W.2d 763.
 
 
 22
 'The language in the Banister case, as above quoted, has been reiterated in many subsequent cases. So from our holdings, the law is clear: the question is whether the facts are entirely inconsistent with any reasonable hypothesis of death other than by suicide. In other words, for the Insurance Company to be entitled to an instructed verdict in this case, the evidence pointing to suicide must be so conclusive that fair minded men can reach no other conclusion.'
 
 
 23
 We do not think here that the evidence pointing to suicide by Bredlow is so conclusive that fair minded men could reach no other conclusion. It is not for us to say whether Bredlow came to his death by his own wilful act. The evidence is entirely circumstantial. That introduced by the plaintiffs gives the picture of a normal, happy and contented person, making plans for future pleasure and for work, who had no reason whatsoever to desire to terminate his life, and who was killed by a gun which was dirty, had discharged accidentally before and could have again. The conclusion to be drawn therefrom is that Bredlow did not commit suicide. On the other hand, there is presented the picture of a man who had, at least partially, retired, had time on his hands without the capacity to utilize it in an enjoyable way, who was nervous, dissatisfied and unhappy. From such evidence could be drawn the conclusion that he took his own life. Which ultimate fact is correct? It is not for the judges of the law to say, even if they were of the opinion that 'the theory of death by suicide finds more rational support in the facts established by direct proof than the theory of death by accident-- that there is greater probability from the evidence that death resulted from a suicidal act than an accident--* * *' and we make no such indication here. What we think happened that Sunday morning in Bredlow's office is utterly and absolutely of no consequence in this case unless the circumstances introduced by the evidence are entirely inconsistent with any reasonable hypothesis excepting suicide and force the conclusion that reasonable men could come to but that one determination. Such is not the situation in this case.
 
 
 24
 We refer again to New York Life Ins. Co. v. Thweatt, supra, 254 S.W.2d at page 72:
 
 
 25
 'As stated in Grand Lodge A.O.U.W. v. Banister, supra, the question for this Court on appeal is not whether Thweatt committed suicide, but whether the Insurance Company has repelled all reasonable hypotheses that his death occurred in any way except suicide.'
 
 
 26
 We cannot say here that the defendant has repelled all reasonable hypotheses that Bredlow's death occurred in any way except suicide. Substantial evidence caused the jury to conclude otherwise and it was error on the part of the trial court it grant judgment notwithstanding such verdicts. Cf. Dick v. New York Life Ins. Co., 79 S.Ct. 921. Case No. 16,052 must be reversed.
 
 
 27
 We next consider the New York Life Insurance Company's appeal in case No. 16,053, wherein it is contended by the defendant that even if case No. 16,052 should be reversed, the trial court committed errors necessitating a new trial.
 
 
 28
 The first contention is that the plaintiffs did not submit due proof of accidental death. The purpose of the requirement of furnishing 'due proof' is set forth in Annotation, 170 A.L.R. 1262, 1265 (1947):
 
 
 29
 'According to the cases discussing this question, the purpose was to give the insurer sufficient information to enable it to frame an intelligent estimate of its rights and liabilities.'
 
 
 30
 The policies by their terms each insured the life of Reuben W. Bredlow in the amount of $5,000.00 and further provided that the company should pay $10,000.00 (double the face of the policy) upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means.
 
 
 31
 The defendant's agent, Van Manning, filled out and completed the proofs of claim signed by Mrs. Bredlow and Mr. Dortch. It was at his suggestion that the proofs contain, opposite the heading 'Cause of Death', the replies 'Accidental Gunshot Wound' and 'Accidental Gunshot', respectively, because 'I didn't believe he killed himself and apparently no one else could have done it. * * * The only thing it could have been was accidental, so I said to Mrs. Bredlow, I'll put down here 'accidental gunshot wound'. That's why I printed that in there. It was my purpose merely to describe what happened as briefly as I could.' Thereafter, without knowledge of Mrs. Bredlow, Van Manning had Dr. Dishong, the coroner, complete a physician's statement, wherein Dr. Dishong concluded that death was due to suicide. (Dr. Dishong was the coroner but not one of the attending physicians.) Upon receipt of these proofs, the company paid the principal sum of $5,000.00 on each policy but denied the double indemnity benefits. Obviously, the company was then satisfied, as evidenced by its paying $5,000.00 on each policy, that proof of the death of Reuben W. Bredlow had been established. The trial court instructed the jury that the only question for decision was whether or not Bredlow's death resulted from self-destruction, whether sane or insane. To this instruction defendant took no exception, thereby indicating that it was completely satisfied that the court had correctly stated to the jury the only question in the case.
 
 
 32
 After plaintiffs had established a prima facie case by showing that Bredlow came to his death as a result of a gunshot wound (alleged in the proof submitted to the company and acted upon by them), the presumption against suicide came into operation and it became the defendant's burden to overcome that presumption if it could. We find that the purpose of submitting due proof was fully served by the proofs of claim filled out together with the presumption that followed. The claim that plaintiffs did not submit due proof of accidental death is without merit.
 
 
 33
 It is the defendant's further contention that the court prejudicially erred in refusing to admit into evidence the death certificate which indicated that the coroner who made it out was of the opinion that Bredlow's death was 'suicide'. The basis for defendant's contention is Section 82-505, Ark.Stats. (Supp.1957), which in part states as follows:
 
 
 34
 '* * * and any such copy of the record of a birth or death, when properly certified by the State Registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated.'
 
 
 35
 It is significant to note that the statute in question provides that the certificate or copy thereof shall be prima facie evidence of the facts therein stated. The issue of whether the death was suicidal or accidental is not a fact within the meaning of the statute. See New York Life Ins. Co. v. Anderson, 8 Cir., 1933, 66 F.2d 705, 706. Inasmuch as all of the facts contained in the death certificate were admitted or not in dispute, and the sole and only purpose of the offer was to get before the jury the coroner's personal opinion that the death was caused by suicide, we find there was no impropriety and no prejudice to the defendant in sustaining objections to the offer. The certificate was inadmissible for the purpose for which it was offered.
 
 
 36
 It is similarly contended here that 'the physician's statement, which was part of the proof of claim, should have been admitted in evidence.' Such 'physician's statement' is separate and apart from the officially required 'death certificate', the admissibility of which we have just discussed. Both the death certificate and the so-called physician's statement obtained by agent Van Manning were made by Dr. H. A. Dishong, a physician who was also the coroner. The physician's statement which Van Manning attached to the proofs of claim also contained an expression of Dr. Dishong's opinion that the death was the result of suicide. Defendant directs attention to a statement in the 'Proofs of Death-- Claimant's Statement' which each plaintiff signed, reading as follows:
 
 
 37
 'In connection with this claim, I understand that upon request of the Company, it will be necessary for me to furnish a written statement from each physician who examined or treated the deceased at any time during the last three years prior to death, as well as any other statements or documents listed on the reverse side hereof, as shall be applicable to this claim. I hereby agree that all such statements and documents as shall be filed with the Company shall constitute a part of these Proofs of Death.'
 
 
 38
 It bases its claim that Dr. Dishong's 'physician's statement' was admissible as part of the proof of claim because of the foregoing. First, Dr. Dishong was not one of the attending physicians. He had not examined or treated the deceased at any time during the last three years prior to his death. Such physicians were listed on the proof of death as beling Dr. J. Donald Hayes, Dr. Walter F. Carruthers, and Dr. J. Harry Hayes. The statement of Dr. Dishong was obtained without the knowledge, consent or approval of the plaintiffs and should not have been admitted for any purpose. But even if it could be said that this was a written statement by a physician who had examined or treated the deceased during the last three years prior to death, it would still be improper for the purpose offered; i.e., to show the opinion of the physician as to whether the gunshot wound was intentionally self-inflicted. The admissibility of a physician's statement to establish cause of death came before this court in Krug v. Mutual Ben. Health & Accident Ass'n, 8 Cir., 1941, 120 F.2d 296. Therein the defendants had introduced in evidence a certified copy of the certificate of death in accordance with the General Statutes of Kansas 1935, 65-144, making such copy 'prima facie evidence in all courts and places of the facts stated therein.' In rebuttal, the plaintiff had offered the attending physician's certificate executed by the same doctor in connection with proofs of death on the insurance company forms. The trial court sustained objections to the offer. On appeal, this court, speaking through Judge John Sanborn, said, 120 F.2d at page 300:
 
 
 39
 'We think that the court below ruled correctly in excluding the statements of Dr. O'Donnell contained in the Attending Physician's Certificate signed by him on January 5, 1938. The doctor was not a witness upon the trial, and his statements in the death certificates were not to be regarded as his testimony, but merely as a part of a public record which was admissible because the law made it prima facie evidence of the facts which it recited. If the defendants had offered the certificate of death as being Dr. O'Donnell's testimony as to the cause of death, it would have been incompetent for that purpose. It was admissible for what it was,-- a public record reciting the fact and cause of death. While the death certificate was subject to rebuttal and to explanation, we are satisfied that it could not be impeached, amended or explained by the hearsay statements of those who were required by law to make and file it. It was not a record of Dr. O'Donnell, but a record of the State of Kansas. Had Dr. O'Donnell testified at the trial that he was not told by the insured of any accident, or that he was certain that no accident had contributed to the death of the insured, his (the doctor's) certificate of January 5, 1938, to The Mutual Life Insurance Company of New York could have been used to impeach him.'
 
 
 40
 So here, if Dr. Dishong had testified to something contrary to that contained in the physician's statement, it could have been used to impeach him. It was not admissible for the purpose offered.
 
 
 41
 We have been unable to find that the Supreme Court of Arkansas has spoken on the admissibility of either a certificate of death or physician's statement. That court does hold, however, that a coroner's jury verdict is inadmissible for the purpose of proving the defense of suicide. In Guardian Life Ins. Co. v. Dixon, 1922, 152 Ark. 597, 240 S.W. 25, 28, that court said:
 
 
 42
 'It is also assigned as error that the court excluded from the jury the proceedings of the coroner's inquest which contained the finding that Dr. Dixon came to his death by a gunshot wound self-inflicted. This court has held that where, in an action against a life insurance company to recover for the death of the insured, the defense is that he committed suicide, the duly certified verdict of a coroner's jury is not admissible for the purpose of proving such defense. American Nat. Ins. Co. v. White, 126 Ark. 483, 191 S.W. 25.'
 
 
 43
 We do not believe it can be successfully urged that Arkansas, while refusing to accept a coroner's jury verdict, would accept the opinion of the physician-coroner in a certificate of death or physician's certificate.[1] We find no error in either ruling of the court.
 
 
 44
 Defendant contends that it should have been allowed to make the opening and closing statements to the jury. It asserts that, '* * * the presumption against suicide exists throughout the trial, placing upon the assurer the burden of proving its affirmative defense,' and that 'the denial of this right (to open and close) to the defendant is ground for reversal.' The general rule is correctly stated in 53 Am.Jur., Trial, 72, p. 73 (1945):
 
 
 45
 'Effect of Denial of Right.-- While the right to open and close is an important right, and according to the holding of some cases the denial thereof in a jury case constitutes reversible error, the prevailing view is that the right to open and close is a mere question of trial practice, and that a ruling of the trial court refusing to accord the right is not a proper subject for an exception, or, as some courts put it, there will be no interference by an appellate court unless there is an abuse of discretion. Where it cannot be seen that a party was prejudiced in being denied the right to open and close, the ruling of the trial court will not be disturbed. In any case the right is one that may be waived.'
 
 
 46
 In the instant case, the trial had opened upon the assumption that the plaintiffs had the burden of proof. They made the opening statement and introduced their evidence first. It was only after the testimony was completed and after discussion pertaining to the instructions to the jury had been had that the defendant asked that it be permitted to open and close the arguments. Under the circumstances, we do not consider the assertion of the right to have been timely made and further conclude that there obviously was no prejudice and accordingly no error.
 
 
 47
 . defendant has alleged that the trial court committed additional errors. We have considered all of them and find that if there was error, it was harmless and non-prejudicial, and therefore unavailable to defendant in securing a new trial. See Rule 61, F.R.C.P., 28 U.S.C.A., and 28 U.S.C.A. 2111; Walsh v. Bekins Van Lines Co., 8 Cir., 1954, 217 F.2d 388, 390; Illinois Terminal R. Co. v. Friedman, 8 Cir., 1953, 208 F.2d 675, 680, rehearing denied 8 Cir., 210 F.2d 229; Valley Shoe Corp. v. Stout, 8 Cir., 1938, 98 F.2d 514, 520-521, and cases cited therein.
 
 
 48
 Case No. 16,052 is reversed with directions to reinstate the judgments. Case No. 16,053 is affirmed.
 
 
 
 [1]
 In Ocean Accident & Guarantee Corporation, Limited v. Schachner, 7 Cir., 1934, 70 F.2d 28, 32, the court said: 'A coroner's verdict does not constitute evidence of any fact or finding therein stated, and is not admissible as such. Peoria Cordage Co. v. Board, 284 Ill. 90, 119 N.E. 996, L.R.A.1918E, 822; Albaugh-Dover Co. v. Board, 278 Ill. 179, 115 N.E. 834; Novitsky v. Knickerbocker Ice Co., 276 Ill. 102, 114 N.E. 545; Wasey v. Travelers' Ins. Co., 126 Mich. 119, 85 N.W. 459; Krogh v. Brotherhood, 153 Wis. 397, 141 N.W. 276, 45 L.R.A. (N.S.) 404; In re Dolbeer's Est., 149 Cal. 227, 86 P. 695, 9 Ann.Cas. 795.'
 See also Holloway v. Bankers Life Co., 1957, 248 Iowa 517, 81 N.W.2d 453; Federal Life Ins. Co. v. Maples, 1951, 204 Okl. 195, 228 P.2d 363; Langlitz v. American Nat. Ins. Co., Tex.Civ.App.1940, 146 S.W.2d 484; Shiovitz v. New York Life Ins. Co., 1937, 281 Mich. 382, 275 N.W. 181; Washington Nat. Ins. Co. v. Chavez, Tex.Civ.App.1937, 106 S.W.2d 751; Morton v. Equitable Life Ins. Co. of Iowa, 1934, 218 Iowa 846, 254 N.W. 325, 96 A.L.R. 315; Metropolitan Life Ins. Co. v. Plunkett, 1928, 129 Okl. 292, 264 P. 827.